**Jack COLGAN, Appellant,**

**v.**

**FISHER SCIENTIFIC COMPANY.**

**No. 90–3659.**

United States Court of Appeals, Third Circuit.

Argued Feb. 21, 1991.

Reargued May 7, 1991.

Decided June 19, 1991.

James W. Carroll, Jr. (argued), Tabakin, Carroll & Curtin, Pittsburgh, Pa., for appellant.

Edward N. Stoner, II (argued), Kathy L. Cerminara, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee.

Donald R. Livingston, Gen. Counsel (Acting), Gwendolyn Young Reams, Associate Gen. Counsel, Lorraine C. Davis, Asst. Gen. Counsel, Robert J. Gregory (argued), Paul D. Ramshaw, E.E.O.C., Washington, D.C., for amicus curiae, E.E.O.C.

Argued Feb. 21, 1991.

Before GREENBERG and COWEN, Circuit Judges, and BUCKWALTER, District Judge *.

Reargued May 7, 1991.

Before SLOVITER, Chief Judge, and BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, and ALITO, Circuit Judges.

---

* Honorable Ronald L. Buckwalter, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

Jack Colgan appeals from the district court's order of August 29, 1990, which granted summary judgment to Fisher Scientific Company in his suit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 626–633a, following his discharge from employment by Fisher. The summary judgment was granted on the procedural ground that Colgan's charge filed with the Equal Employment Opportunity Commission ("EEOC") was untimely as he filed it more than 300 days after he received a poor rating in a performance evaluation and he thus failed to preserve his claim. In the alternative on the merits, the district court held that Colgan did not establish that there was a genuine issue of material fact to undermine the nondiscriminatory reason advanced by Fisher to justify its actions. *Colgan v. Fisher Scientific Co.*, 747 F.Supp. 299 (W.D.Pa.1990). We cannot say that the limitations period under the ADEA started to run on the date Colgan received his performance evaluation and thus we cannot conclude that the charge was untimely. Furthermore, we hold that because of a genuine dispute of material fact summary judgment on the merits should not have been granted. Accordingly, we will vacate and remand the matter.

### I. FACTS AND PROCEDURE

Fisher hired Colgan as a machine operator in its Indiana, Pennsylvania, facility on December 8, 1952.[1] During Colgan's employment with Fisher his salary was raised 42 times for various reasons, including cost-of-living adjustments, provisions in union contracts, annual increments, and his promotion on April 28, 1975, to Machine Shop Foreman, a supervisory position. Between 1975 and 1982, Colgan received evaluations of his performance as a supervisor on a sliding scale for each rated attribute. These individual ratings were generally good, approaching outstanding. Each

---

1. We have taken the facts from the extensive discovery in this case.

year's evaluation form also included his supervisor's written remarks; the evaluations frequently stated that Colgan was cooperative and dependable, adapted to change well, and had leadership qualities, good judgment, and a good attitude.[2] In 1983, Fisher changed its evaluation form to provide a single numerical scale indicating the employee's overall performance, in addition to the supervisor's written comments. The scale ranged from 1.0, "exceptionally high—rarely achieved," to 5.0, "unsatisfactory," with a midpoint of 3.0 indicating "typical." In 1983, Colgan received a numerical rating of 3.0.

The following year, Fisher changed the terminology on the scale: 1.0 became "outstanding;" 3.0 became "met requirements," and 5.0 remained "unsatisfactory." Edmund Zalewski, the Manager of Component Manufacturing and Colgan's direct supervisor, prepared Colgan's 1984 evaluation and gave Colgan a rating of 2.5, falling between "exceeded requirements" and "met requirements." In February 1985, Fisher gave Colgan the additional responsibility of supervising the tool room. In September 1985, Colgan received a 2.75 rating from Zalewski, which fell in the same range as the previous year's rating, but was obviously somewhat less favorable. Zalewski wrote that Colgan "has shown capacity for additional responsibility by taking over supervision of tool room and establishing procedural changes within it to make it a more effective support department." On November 25, 1985, Fisher offered its employees an early retirement program for which Colgan qualified, but on January 15, 1986, he declined to participate in the program.

In early 1986, Fisher implemented the Kaelin "just-in-time" program which relies on stringent production schedules and coordination among departments so that at each stage of production parts are received only as needed. Fisher hired outside consultants to implement the program. Claus P. Parow, Zalewski's supervisor, discussed the Kaelin system with Colgan in March or April 1986, because Colgan was falling behind in his responsibilities relating to the system. Nonetheless, on March 31, 1986, Fisher gave Colgan the additional responsibility of supervising the castaloy department. Robert F. Hundley, the plant manager, made the decision to give Colgan this responsibility but Thomas F. Mittelhauser, Fisher's Manager of Human Resources, and Zalewski approached Colgan about the change. According to Hundley, while Colgan did not refuse to supervise the castaloy department, he did express concern that supervising three departments was too much for one person. Mittelhauser promised Colgan before he took over the castaloy group that he would get whatever help he needed to perform the job. The previous castaloy supervisor retired pursuant to the early retirement program, but stayed on until June 1986 to assist Colgan with the transition.

That month George Kowchuck replaced Zalewski as Colgan's immediate supervisor. Although Zalewski had supervised Colgan from September 1985 to May 1986, he did not participate in Colgan's August 1986 performance evaluation; rather, Kowchuck, who had supervised Colgan for ten weeks, excluding a two-week plant shutdown in July, wrote the evaluation. The 1986 performance evaluation stated that Colgan's performance had declined since his last evaluation. While the evaluation made some positive comments on quality awareness and safety, under the category "Results not meeting expectations or which present opportunities for improvement," Kowchuck's written remarks were:

INTERACTING DEPT. TO DEPT. ESTABLISH A FIRM FOLLOW UP PROCEDURE. HAS NOT ADAPTED TO A CHANGING WORK REQUIREMENT,

---

**2.** The following comments can be found in the evaluations: "has good knowledge"; "appears to have qualities for leadership"; "communicates well"; "judgment in all areas is good"; "constantly talks about cost improvements"; "people respect him"; "above average"; "excellent job knowledge"; "never needs prodding"; "sets good objective"; "self starter"; "easily adjusts"; "self taught"; "improved safety record of department." We do not suggest that all the comments were that favorable.

CASTALOY AREA, PRODUCTIVITY PROGRAM, POSITIVE OBJECTIVITY.

App. at 90.

Further comments provide:

HAS A GOOD WORKING KNOWLEDGE OF PRODUCT, BUT NEEDS TO DEVELOP A POSITIVE ATTITUDE, WITH ENTHUSIASM, TO ACHIEVE THE NECCESSARY (sic) REQUIREMENTS FOR EXPANDING HIS CAREER HORIZONS. NEEDS TO ANALYZE ONES (sic) SELF AND GAIN POSITIVE MOTIVATION.

*Id.*

Kowchuck placed a checkmark next to the statement on the form: "Unless there is a significant improvement in performance, demotion, reassignment or separation is indicated." His written comments provided "JACK'S PERFORMANCE WILL BE REVIEWED AGAIN IN THE NEXT 60 TO 90 DAY'S (sic). IF A DEFINITE IMPROVEMENT IS NOT SHOWN IN THAT TIME FRAME, ADDITIONAL ACTION WILL BE TAKEN."

In this evaluation, Colgan's overall performance was originally rated on the scale at about 3.5; however, this mark was crossed out and 4.0 "below requirements," was marked instead. Parow had instructed Mittelhauser, the human resources manager, to downgrade the rating from 3.5 to 4.0, and Mittelhauser initialed the change because Parow believed he was not allowed to touch the form. Mittelhauser stated at his deposition that he did not recall any instance in which either he or another supervisor downgraded an employee's initial numerical evaluation and that a numerical rating of 4.0 was the lowest evaluation he had ever seen. Despite this evaluation, Colgan received a raise of $13.00 per week on September 1, 1986. In their depositions, the various Fisher personnel offer three general explanations for Colgan's poor evaluation: his failure to embrace and to follow the Kaelin "just-in-time" program; his leaving work early; and his refusal and/or failure to produce budgets for his three departments when requested by his supervisor, Kowchuck.

However, the *primary* basis for the poor evaluation was that Colgan did not adequately implement the Kaelin program in his departments. Parow stated that he received complaints from the consultants hired to implement the Kaelin system because Colgan "was not following the program, and his attitude seems that he does not want to." The second alleged problem with Colgan's performance, which is not mentioned on the performance evaluation, is that Colgan generally left the plant early. Mittelhauser, Parow, Kowchuck, and Hundley each stated that Colgan often left during the seven-minute "wash-up time" before the 4:00 p.m. close of the shift so he could beat the traffic. The third alleged problem involved a dispute between Kowchuck and Colgan in which Colgan alleges that Kowchuck asked for Colgan's budgets for his three departments overnight even though Kowchuck had three to four weeks to produce those budgets and had given other supervisors two weeks to complete theirs. Kowchuck told Parow that Colgan refused to do the budget for his three departments. Parow stated, however, that Colgan had never before refused to do a budget in his previous 12 to 13 years as a supervisor.

Colgan appealed his performance evaluation to a committee comprised of Parow, Kowchuck, and Mittelhauser, but it declined to change the evaluation. During the meeting, Parow asked Colgan why he did not stay late if he was overworked. Additionally, Mittelhauser said to Colgan "You don't seem to care about your job, your company or your people." Parow also stated that Colgan's appeal of his performance evaluation was the only appeal in which he had ever participated.

On November 24, 1986, Fisher implemented a "Workforce Reduction Policy for Salaried Employees" ("reduction policy"), setting forth the factors to be considered in laying off employees. It previously had not had such a written policy. On December 5, 1986, 11 days later, Colgan was notified of his termination pursuant to section III(C)2c of Fisher's reduction policy which provided that, after agency and temporary part-time personnel, those regular

employees who received a performance rating less favorable than 3.0 would be selected for termination first. Colgan's duties were added to those of two younger Fisher employees, ages 44 and 27 years. Four other employees in the same category as Colgan (regular, full-time) let go on the same day were 31, 33, 37, and 34 years old.

Colgan filed a charge of age discrimination with the EEOC on July 16, 1987, and he filed his complaint in this action in the United States District Court for the Western District of Pennsylvania on December 5, 1988. In the district court he asserted claims under the ADEA and under state law for intentional infliction of emotional distress and alleged that he had "duly exhausted his administrative remedy and satisfied all jurisdictional prerequisites to suit."

Colgan moved to withdraw voluntarily his claim for intentional infliction of emotional distress in August 1989 and Fisher moved for summary judgment on the ADEA claim. On August 17, 1989, the district court filed a memorandum order dismissing the emotional distress claim and denying Fisher's motion for summary judgment even though Fisher had not yet filed a reply brief to Colgan's answering brief on its motion. At a subsequent pretrial conference, the court recognized that it had ruled before Fisher filed its reply brief and at that time it granted Fisher's motion for summary judgment and dismissed Colgan's complaint in its entirety.

In its opinion granting summary judgment the district court explained that Colgan's July 16, 1987, charge with the EEOC was not timely because he filed it more than 300 days after his negative performance evaluation in August 1986. This period is critical because, as we will explain below, 29 U.S.C. § 626(d) provides that in the circumstances of this case an ADEA action may not be commenced unless a charge of unlawful discrimination is filed with the EEOC within 300 days of the alleged unlawful practice. The court stated:

> [Colgan] has taken the position in this litigation that [Fisher's] discriminatory employment decision was not his actual termination, but instead was his allegedly false August, 1986 evaluation.

*Colgan v. Fisher Scientific Co.*, 747 F.Supp. at 301 (citing Colgan Affidavit ¶ 30; Memorandum in Opposition to Defendant's Motion for Summary Judgment at 10 (Aug. 14, 1989); Transcript of Pretrial Conference at 17 (July 30, 1990)).

Having determined that the evaluation was the discriminatory act, the court reviewed the Supreme Court's decisions in *United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (seniority system that gives present effect to past discriminatory conduct is not a continuing violation absent allegation that the system was intentionally designed to discriminate), *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (discriminatory denial of tenure, rather than resulting nondiscriminatory termination of employment one year later, triggers limitation period), and *Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989) (charge that change to seniority system that allegedly intentionally discriminated on basis of gender must be filed within a time measured from the change in seniority system, the discriminatory event, rather than subsequent demotions, its later effect). The court noted that these Title VII cases were applicable in determining whether there had been a timely exhaustion of administrative remedies in ADEA cases. *Colgan*, 747 F.Supp. at 301 & n. 3. The district court stated that the *Lorance* Court had upheld the district court's grant of summary judgment for the employer based on untimeliness of the charge in a situation in which in 1979 the employer had adopted a seniority system which was not alleged to be discriminatory on its face or as applied because the plaintiffs did not file their administrative charges until 1983 when they were demoted pursuant to the seniority system. *Id.* at 302. The district court quoted a negative example discussed in *Lorance*:

> Indeed, a given plaintiff could in theory sue successively for not being promoted, for being demoted, for being laid off, and

for not being awarded a sufficiently favorable pension, so long as these acts—even if nondiscriminatory in themselves—could be attributed to the 1979 change in seniority. Our past cases, to which we adhere today, have declined to follow an approach that has such disruptive implications.

*Id.* (quoting *Lorance,* 490 U.S. at 912–13, 109 S.Ct. at 2269).

The district court rejected Colgan's argument that our decision in *Bonham v. Dresser Industries, Inc.,* 569 F.2d 187 (3d Cir.1977), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), required that the limitations period run from the date of his discharge. *Bonham* held that the date of notification of termination if it coincides with the employee's last day of work rather than the date that benefits terminate starts the limitations period. The district court distinguished *Bonham* on its facts, stating that in *Bonham* the plaintiff had alleged that his termination was discriminatory; here, Colgan asserted that his performance evaluation, which preceded his termination, was the discriminatory act. *Colgan,* 747 F.Supp. at 302. Quoting from *Bonham,* the court stated:

> The [limitations] period does not begin to run until the employee knows, or as a reasonable person should know, that the employer has made a final decision to terminate him, and the employee ceases to render further services to the employer.

*Id.* (quoting *Bonham,* 569 F.2d at 192). The district court determined that this language had been undercut by the Supreme Court's subsequent decision in *Lorance* which held that an employee is required to file a timely administrative charge upon suffering a concrete harm from a "patently" discriminatory seniority system. *Colgan,* 747 F.Supp. at 303 (citing *Lorance,* 490 U.S. at 907 n. 3, 109 S.Ct. at 2266 n. 3).

The district court then stated that "[w]e find that [Colgan] was put on notice at the time of his evaluation that his *employment status had been impacted.*" *Id.* (emphasis added). Noting that Colgan's evaluation expressly provided that he would be reviewed again in 90 days and that, absent significant improvement, he would be subject to demotion, reassignment, or separation, the court concluded that:

> [i]n effect, [Colgan] was placed on probationary status by the terms of this evaluation at a time when his employer was suffering severe economic difficulties. Under these circumstances, [Colgan] received unequivocal notice that he had suffered a concrete harm, which harm further manifested itself during the December reduction in force.

747 F.Supp. at 303 (citation omitted).

Finally on the timeliness issue, the district court stated that adopting Colgan's contention that he was not required to file charges until he received notice of his termination would allow him to circumvent the relatively short limitations period provided by the statutory scheme. *Id.* Finding that Colgan's interpretation echoed the "disruptive" example discussed by the *Lorance* Court, the district court held that he was required to file his administrative charges within 300 days of his performance evaluation and, as he failed to do so, his suit was barred. *Id.*

The district court then reached the merits of the case by considering Fisher's contention that the discharge was not predicated on Colgan's age. The court held that even if it could not grant summary judgment in favor of Fisher on the timeliness issue, it would do so on the merits because Colgan had "failed to produce any evidence or credible argument which would raise an issue of material fact with regard to pretext." *Id.* The court rejected Colgan's assertion that he could establish by a preponderance of the evidence that Fisher's explanation for the discharge was pretextual through the affidavits of his co-workers about his work history prior to the August 1986 performance evaluation. The court found that Colgan's co-workers, as equal or subordinate employees in Fisher's hierarchy, were "not in a position to have personal knowledge of plaintiff's performance in light of management objectives." The court also rejected an affidavit filed on behalf of Colgan by Jay K. Jarrell, a certi-

fied personnel consultant. While Jarrell stated that Fisher did not follow its own procedures in conducting the August 1986 performance evaluation, the court would not credit the affidavit as it determined that Jarrell did not have personal knowledge of Fisher's custom and policy and his conclusions were based solely on a review of documents. Furthermore, it found his report to be speculative. The court pointed out that Jarrell did not work for Fisher and, therefore, he had no evidence that these policies were in effect or how they were applied.

Finally, the district court rejected Colgan's contention that the August 1986 performance evaluation, occurring after a long history of good evaluations, could alone establish pretext by a preponderance of the evidence. In this regard the court cited *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 344 (3d Cir.1990), which indicates that the circumstance that an employee has received favorable reviews does not in itself allow an inference of pretext to be drawn from later unfavorable employment actions. The court refused to draw any inference from Colgan's declining to accept Fisher's November 1985 offer of voluntary early retirement. *Colgan*, 747 F.Supp. at 305 (citing *Gray v. New England Telephone & Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986); *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 344 (D.C.Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 369 (D.N.J. 1987) (offer of early retirement program does not create presumption of ADEA violation), *vacated in part on other grounds sub nom. Lusardi v. Lechner*, 855 F.2d 1062 (3d Cir.1988)). Thus, the court stated that Colgan "has failed to produce any evidence, direct or indirect, from which an inference of pretext can be drawn." *Colgan*, 747 F.Supp. at 305. This appeal followed.

## II. DISCUSSION

### A. *Standard of Review*

On review of a district court's grant of summary judgment,

the appellate court is required to apply the same test the district court should have utilized initially. Inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt.

*Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

The Supreme Court outlined the requirements for disposition of a summary judgment motion in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It held that Fed.R. Civ.P. 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. at 2552. The moving party need not support its motion with affidavits. *Id.* at 323, 106 S.Ct. at 2553. In responding to a motion for summary judgment, the nonmoving party with the burden of proof on a dispositive issue at trial must "go beyond the pleadings, and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553. This evidence need not be in a form that would be admissible at trial. *Id.*

### B. *Timeliness*

#### 1. The Statutory Provisions

The timeliness provisions of the ADEA germane to this appeal are set forth in 29 U.S.C. § 626(d), which provides:

No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimi-

nation has been filed with the [EEOC]. Such a charge shall be filed—

(1) within 180 days after the alleged unlawful practice occurred; or

(2) in a case to which section 633(b) of this title applies, within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.

29 U.S.C. § 633(b) states:

In the case of an alleged unlawful practice occurring in a State which has a law prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory practice, *no suit may be brought under section 626 of this title before the expiration of sixty days after proceedings have been commenced under the State law, unless such proceedings have been earlier terminated* ... (Emphasis added.)

Pennsylvania provides a cause of action for employment discrimination based on age in the Pennsylvania Human Relations Act, Pa.Stat.Ann. tit. 43, §§ 951–962.3 (Purdon Supp.1990). Under that statute the aggrieved party must file an administrative charge with the Pennsylvania Human Relations Commission. Pa.Stat.Ann. tit. 43, § 959.

Fisher argues that we should hold this action is barred because Colgan did not file an administrative charge with the Pennsylvania commission within the 180 day limitation of section 626(d)(1) or, indeed, at all.[3] It points out that Colgan's employment was terminated on December 5, 1986, and that the only administrative charge Colgan filed was filed more than 180 days later with the EEOC on July 16, 1987. Therefore, in its view this case is untimely even if the time for filing the charge is measured from Colgan's termination rather than his evaluation. It urges that Colgan should not be able to take advantage of the circumstance that Pennsylvania has adopted a human relations act to obtain the advantage of the 300–day period as he did not file under that act.

We reject Fisher's contention. The Supreme Court stated in *Mohasco Corp. v. Silver*, 447 U.S. 807, 816, 100 S.Ct. 2486, 2492, 65 L.Ed.2d 532 (1980), "[n]othing in the [Civil Rights] Act suggests that the state proceedings may not be initiated by the EEOC acting on behalf of the complainant rather than by the complainant himself...." *Id.* (emphasis added) (quoting *Love v. Pullman Co.*, 404 U.S. 522, 525, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972)). EEOC regulations provide in Title VII cases that:

[w]here any document, whether or not verified, is received by the Commission ... which may constitute a charge cognizable under Title VII, and where the [state agency] has not waived its right to the period of exclusive processing with respect to that document, that document *shall be deferred to the appropriate [state agency]* ...

29 C.F.R. § 1601.13(a)(4)(i) (emphasis added).

EEOC regulations further provide that in an ADEA case the EEOC "may refer all charges to any appropriate State agency" and that Pennsylvania is a state to which ADEA charges may be referred. *Id.* § 1626.9. Accordingly, we think that for purposes of the filing issue we should regard the EEOC filing as a Pennsylvania filing. Thus, we adhere to our holding in *Davis v. Calgon Corp.*, 627 F.2d 674, 677 (3d Cir.1980) (per curiam), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981), in which in an ADEA case we held that "a plaintiff in a deferral state [such as Pennsylvania] is entitled to the extended period [of 300 days] provided by § 626(d)(2) regardless of whether *he* has filed a state administrative complaint within 180 days after the alleged *discrimination* occurred." *Id.* (emphasis added). In *Davis* the plaintiff filed state and EEOC charges between 180 and 300 days after the alleged unlawful practice but we relied solely on the EEOC charges in concluding the filing was

---

**3.** Notwithstanding 29 U.S.C. § 633(b) Fisher does not contend that this action is premature.

*See Callowhill v. Allen–Sherman–Hoff Co.*, 832 F.2d 269, 273 n. 5 (3d Cir.1987).

timely, thus implying that the state filing was not material on that issue. *Id.* at 677.

We are aware of *Kocian v. Getty Refining & Marketing Co.,* 707 F.2d 748, 752 (3d Cir.1983), a Title VII case. In *Kocian* we held that the 300–day limitations period is available to a litigant in a deferral state only when the EEOC or the litigant has instituted state or local proceedings. But *Kocian* was decided prior to the adoption of 29 C.F.R. § 1601.13(a)(4) providing for deferral of an EEOC complaint to the state agency and in any event is not binding on this in banc court. Furthermore, in *Callowhill v. Allen–Sherman–Hoff Co.,* 832 F.2d 269 (3d Cir.1987), we indicated in an ADEA case that "[i]n a state such as Pennsylvania which has an agency performing functions similar to those of the EEOC, the time for filing is extended to 300 days or to a period within 30 days of receipt by the individual of notice of termination of proceedings under state law, which ever is earlier." *Id.* at 271. In sum, the 300–day limitation for administrative filing in section 626(d)(2) applies to Colgan's action.[4]

### 2. The *Evans–Ricks–Lorance* Trilogy

■ Resolution of the 180/300–day problem does not, however, put the timeliness issue at rest for Colgan did not file his charge with the EEOC within 300 days of his receipt of the performance evaluation. Thus, we must decide if the time for filing the charge is to be measured from when he received the evaluation or from when Fisher adopted its written reduction in force policy or terminated Colgan. Our analysis of this aspect of the timeliness question begins with the Supreme Court's *Evans–Ricks–Lorance* trilogy.[5] In *United Air Lines Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571, the Court dealt

with Evans's sex discrimination claim against United in a situation in which she was terminated pursuant to a policy requiring female flight attendants to resign when they married. Evans resigned pursuant to this "no marriage" rule in 1968, but her union and United later entered a collective bargaining agreement eliminating the rule. On February 16, 1972, United hired Evans as a new employee, and accordingly she was treated for seniority purposes as if she had no prior service. This treatment caused her to bring a Title VII complaint which was met with a timeliness objection as she had not filed an EEOC charge after her resignation in 1968.

In evaluating the timeliness of Evans's charge, the Court noted that she did not claim that United's current seniority system treated males and females unequally even though males hired between 1968 and 1972 acquired more seniority than she did, for females hired during this period had acquired the same seniority as males. Additionally, both male and female employees terminated or otherwise discharged before 1968 and later re-employed were treated as new employees. The Court explained that, although United's seniority system had a continuing impact on her pay and fringe benefits, "the critical question is whether any present *violation* exists." *Id.* at 558, 97 S.Ct. at 1889. It determined that United was not then violating Title VII because the seniority system was neutral in its operation. It concluded that, as Evans "did not file a timely charge based on her 1968 separation and she has not alleged any facts establishing a violation since she was rehired in 1972," the district court correctly dismissed her complaint. *Id.* at 559, 97 S.Ct. at 1889.

---

**4.** We also point out that the EEOC is authorized to enter into worksharing agreements with state fair employment practices agencies. 29 C.F.R. § 1626.10. It has such an agreement with the Pennsylvania commission by which they divide responsibility, at least in Title VII cases. *See Trevino–Barton v. Pittsburgh Nat'l Bank,* 919 F.2d 874 (3d Cir.1990).

**5.** We obviously cannot decide this case on the basis of *Bonham v. Dresser Industries, Inc.,* 569

F.2d 187, as *Ricks* and *Lorance* were decided later. If *Bonham* applied Colgan's charge would surely have been timely. The parties state that the trilogy, though arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* is precedential in this ADEA case and we agree. *See Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979).

In *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, on certiorari from this court, the Supreme Court in reversing held that an allegedly discriminatory denial of tenure, rather than a discharge pursuant to that denial, was the unlawful employment practice triggering the limitations period for charges under Title VII; thus, Ricks's action was time-barred because he did not file his charge within the applicable time limit measured from the denial of tenure. *Id.* at 259, 101 S.Ct. at 504. At Delaware State College, the Faculty Committee on Promotions and Tenure ("tenure committee") recommended in February 1973 that Ricks not receive a tenured position in the education department, but it agreed to reconsider its recommendation the following year. In February 1974, the tenure committee adhered to its previous recommendation; the following month, the faculty senate voted in favor of supporting the negative recommendation. On March 13, 1974, the college's board of trustees formally voted to deny tenure to Ricks.

Ricks immediately filed a grievance with the board's Educational Policy Committee. On June 26, 1974, during the pendency of the grievance, the trustees offered Ricks a one-year "terminal" contract, in accordance with its previous policy not to discharge immediately a junior faculty member denied tenure. Ricks signed the contract, which expired on June 30, 1975. In September 1974, the grievance committee notified Ricks that it denied his grievance. Ricks filed his charge with the EEOC on April 4, 1975.

The Court identified the denial of tenure as the unlawful employment practice of which Ricks complained. It rejected Ricks's contention that, because the college acted with a discriminatory motive in the denial of tenure and the discharge, his discharge following the denial of tenure was a "continuing violation." The Court explained that "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* at 257, 101 S.Ct. at 504 (citing *Evans*, 431 U.S. at 558, 97 S.Ct. at 1889). The Court stated that, to extend the limitations period to the date of discharge, Ricks would have had to allege and to prove "that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who had been denied tenure." *Ricks*, 449 U.S. at 258, 101 S.Ct. at 504. The Court noted that rather than being an independent discriminatory act, "termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure." *Id.* at 257–58, 101 S.Ct. at 504.

The Court determined that, by June 26, 1974, the college had established its official position which was made apparent to Ricks and therefore the limitations started no later than that time. Thus, the dismissal of Ricks's complaint by the district court for his failure to file a timely charge after June 26, 1974, was appropriate. The Court rejected Ricks's contention that the date the grievance committee denied his grievance started the limitations period, explaining that:

> entertaining a grievance complaining of the tenure decision does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made.

449 U.S. at 261, 101 S.Ct. at 505–06 (emphasis in original).

The Supreme Court rejected our conclusion that the date of termination, June 30, 1975, started the limitations period as well as our reasoning that policy considerations mandated that an employee not be required to file a charge of discrimination while still employed. The Court noted that Ricks received "explicit notice that his employment would end" upon expiration of his terminal contract after his denial of tenure. *Ricks*, 449 U.S. at 258, 101 S.Ct. at 504.

While the Supreme Court in *Ricks* focussed its initial discussion on the college's unlawful employment practice, it *implicitly* provided a notice requirement to trigger the limitations period; that is, when the employer had established its official position and made that position apparent to the

employee by explicit notice. *Id.* at 258, 262 n. 16, 101 S.Ct. at 504, 506 n. 16. The Court continued that, in light of the tenure committee's twice recommending denial, the faculty senate's support of that recommendation, and the board of trustee's formal vote to deny tenure, "there can be no claim here that Ricks was not abundantly forewarned." *Id.*

Finally, in *Lorance v. AT & T Technologies, Inc.*, 490 U.S. 900, 109 S.Ct. 2261, the Supreme Court held that the limitations period under Title VII for a charge with the EEOC begins to run upon the adoption of a seniority system affecting competitive seniority status and not upon the employees' demotion pursuant to the seniority system; thus, the employees' claims were time-barred because they were brought more than three years after the seniority system was adopted and a timely charge was not filed. *Lorance,* 490 U.S. at 902 n. 1, 911, 109 S.Ct. at 2263 n. 1, 2268. The petitioning employees were women who became "testers" between 1978 and 1980. *Id.* at 902, 109 S.Ct. at 2264. Under a 1979 collective bargaining agreement the manner for calculating tester seniority was altered from length of plant-wide service to time spent as a tester. *Id.* at 901–02, 109 S.Ct. at 2263–64. During a 1982 downturn, the collective bargaining agreement caused the petitioning employees to be selected for demotion, which would not have been the case under the previous seniority system. *Id.* These employees alleged that the 1979 change reflected a conspiracy to protect male incumbent testers and to discourage women from seeking positions as testers.

Initially, the Court rejected the employees' argument that the operation of the facially neutral seniority system had a disparate impact on women under Title VII's provision for "practices that are fair in form, but discriminatory in operation." *Id.* at 904, 109 S.Ct. at 2265 (discussing 42 U.S.C. § 2000e–2(a)(2)). The Court found that, although the allegation of disparate impact would *ordinarily* suffice to state a present violation under section 703(a)(2) of Title VII (codified at 42 U.S.C. § 2000e–2(a)(2)), it could not examine the operation of the seniority system as of the date the disparate impact was felt because, pursuant to section 703(h), seniority systems "are afforded special treatment under Title VII." *Lorance,* 490 U.S. at 904, 109 S.Ct. at 2265 (discussing 42 U.S.C. § 2000e–2(h)). The Court explained that section 703(h) provides that an application of different standards pursuant to a bona fide seniority system is not an unlawful practice "provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin." *Lorance,* 490 U.S. at 905, 109 S.Ct. at 2265 (quoting 42 U.S.C. § 2000e–2(h)). The Court stated that it had construed this provision to mean that *"absent a discriminatory purpose,* the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Id.* (emphasis added) (quoting *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 82, 97 S.Ct. 2264, 2276, 53 L.Ed.2d 113 (1977)). Thus, the petitioning employees were required to allege that either the creation or the operation of the seniority system was the result of *intentional* discrimination.

The Court noted that in their complaint the petitioning employees did not assert that the seniority system treated similarly situated employees differently or had been operated in an intentionally discriminatory manner. *Lorance,* 490 U.S. at 905, 109 S.Ct. at 2265. It concluded that the complaint asserted only that the employer intentionally altered the employees' contractual rights with the purpose to discriminate when it adopted the seniority system. *Id.* Although this allegation stated a cause of action, this event had occurred more than three years earlier, well outside the period of limitations for a charge to be filed with the EEOC. *Id.* at 906, 109 S.Ct. at 2265.

The Court also rejected the theory that the demotions were "continuing violations" of the discriminatory adoption of the seniority system, relying in this regard on *Ricks* and *Evans. Id.* at 907–08, 109 S.Ct. at 2266. The Court noted that the allegedly discriminatory conduct in *Ricks,* the denial of tenure, started the limitations pe-

riod even though one of the effects of the denial of tenure, the nondiscriminatory termination of employment, was not felt until one year later. *Id.* at 906–07, 109 S.Ct. at 2266. The Court then rejected the dissent's attempt in *Lorance* to distinguish Ricks's discharge as the "delayed, but inevitable, consequence" of the denial of tenure, whereas the employees' demotions with consequential "concrete harm" were merely speculative at the time the seniority system was adopted, by noting that *all* seniority plans are speculative. The Court rejected the contention that "no concrete harm occurs when an employer provides a *patently less desirable* seniority guarantee than what the law requires." *Id.* at 907 n. 3, 109 S.Ct. at 2266 n. 3 (emphasis added).

Having determined that the recent demotions were not a continuing violation, the Court followed its decision in *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960), in which it held that the limitations period ran from the date of the system's adoption. *Lorance*, 490 U.S. at 909–10, 109 S.Ct. at 2267–68. The Court noted that this interpretation gave effect to the policy underlying statutes of limitation in eliminating stale claims and to the considerations underlying the special treatment afforded to seniority systems, and struck "a balance between the interests of those protected against discrimination by Title VII and those who work—perhaps for many years—in reliance upon the validity of a facially lawful seniority system." *Id.* at 911, 109 S.Ct. at 2269. The Court concluded that to hold otherwise would be disruptive, stating:

> [a]llowing a facially neutral system to be challenged, and entitlements under it to be altered, many years after its adoption would disrupt those valid reliance interests that § 703(h) was meant to protect. In the context of the present case, a female tester could defeat the settled (and worked-for) expectations of her co-workers whenever she is demoted or not promoted under the new system, be that in 1983, 1993, 2003, or beyond. Indeed, a

given plaintiff could in theory sue successively for not being promoted, for being demoted, for being laid off, and for not being awarded a sufficiently favorable pension, so long as these acts—even if non-discriminatory in themselves—could be attributed to the 1979 change in seniority. Our past cases, to which we adhere today, have declined to follow an approach that has such disruptive implications.

*Id.* at 912–13, 109 S.Ct. at 2269.

It is obvious from our description of the *Evans–Ricks–Lorance* trilogy that all three cases are distinguishable on their facts from this one. Thus, they are instructive but not conclusive on our determination of whether Colgan's performance evaluation triggered the running of the limitations period. It is, however, also evident that the Supreme Court has fashioned its determinations concerning the limitations periods to require prompt filing of discrimination charges. Furthermore, it is clear in this case that the performance evaluation was the unlawful practice of which Colgan complains and that his discharge months later was not a continuing violation because it was not itself intentionally discriminatory without regard for the evaluation. While this conclusion might be thought to require us to affirm, it does not end our analysis because it is also evident from the trilogy that an alleged unlawful employment practice, here the performance evaluation, must have inflicted harm which was or should have been noticed, or it will not have triggered the limitations period.[6] As the *Ricks* Court stated, "the limitations periods should not commence to run so soon that it becomes difficult for a layman to invoke the protections of the civil rights statutes." *Ricks*, 449 U.S. at 262 n. 16, 101 S.Ct. at 506 n. 16.

In *Evans*, the employee clearly had notice that the "no marriage" rule was discriminatory because it treated male and female employees differently. Furthermore, there is no question that a policy

---

**6.** We realize that Colgan urges his discharge was an act of age discrimination, but we do not understand him to contend that if the evalua-

tion itself was not discriminatory the discharge alone pursuant to the reduction in force could be actionable and, in any event, it could not be.

requiring resignation upon marriage causes substantial and immediate harm to the employee of which she will be aware. Similarly, the *Ricks* Court expressly adopted a notice requirement to trigger the limitations period; that is, when the employer had established its official position and made that position apparent to the employee by explicit notice. *Ricks,* 449 U.S. at 258, 262, 101 S.Ct. at 504, 506. In light of the tenure committee's twice recommending denial, the faculty senate's support of that recommendation, and the board of trustee's formal vote to deny tenure, the Court concluded that "there can be no claim here that Ricks was not abundantly forewarned." *Id.* at 262 n. 16, 101 S.Ct. at 506 n. 16. Again, the denial of tenure is obviously of sufficient harm to require the employee to act.

The *Lorance* Court's language that the seniority system was *"patently* less desirable" incorporates the notice concept. Under a seniority system, an employee's status with respect to co-workers is fixed, not tentative. The across-the-board adjustment of each employee's status in any seniority system fixes the employees' competitive benefits with respect to their co-workers at the time it is adopted and the *Lorance* plaintiffs knew or should have known it.

Additionally, an adjustment in seniority, which is the basis of eligibility for promotion and other benefits, clearly causes substantial harm to an employee in the form of a "diminution of employment status." *Lorance,* 490 U.S. at 906, 109 S.Ct. at 2265. Once seniority is fixed, an employee's vulnerability to first discharge is also fixed. The consequences that will flow from the change in the seniority system with respect to promotion or, as in *Lorance* to demotion, or to termination, are not tentative or subject to revision if the conditions for them, such as a reduction in

force, are later met. Thus, there is a substantial difference between a change in a seniority plan which, *ab initio,* fixes the employees' rights with respect to their co-workers and the performance evaluation at issue here, which created no rights vis-a-vis co-workers or the employer and which, on its face, was tentative and subject to revision.[7] While there was, of course, a potential that that performance evaluation would become a factor in a later decision involving adverse consequences to Colgan, there would have to be an additional exercise of discretion before any adverse consequences could occur.

Colgan's evaluation provided that his performance would be reevaluated in 60 to 90 days and "[i]f a definite improvement is not shown in that time frame, additional action *will be taken."* (Emphasis added). The obvious conclusion to be drawn from this statement is that a definitive conclusion had not yet been reached. Additionally, the checkmark beside the statement "[u]nless there is significant improvement in performance, demotion, reassignment or separation is indicated," reveals that a determination of final action such as making Colgan subject to demotion or discharge was subject to further consideration. *Id.* The statement clearly signaled that Colgan had an opportunity to redeem himself by an improved performance over the next 60 to 90 days. Contrary to what the district court found, Fisher did not place Colgan on probation and, in fact, gave Colgan a pay raise shortly after the evaluation.[8] As such, Fisher had neither established an official position nor given Colgan explicit notice of its allegedly unlawful employment practice when it reviewed his performance in August 1986. The performance evaluation had no immediate consequence on Colgan's employment, such as a loss of seniority, nor did it alert Colgan to the possibility

---

**7.** This might not be so if there was a clear, though unwritten, reduction in force policy in effect at the time of the evaluation which was known or should have been known to the employee. *See* footnote 9, *infra.*

**8.** The district court's conclusion that Colgan was effectively "on probation" appears to be the

court's characterization of Colgan's situation. Neither the performance evaluation nor the discovery makes reference to probation. Indeed, the performance evaluation suggests that no change in status had occurred, although a change might occur upon Colgan's reevaluation.

that consequences would flow from it without an opportunity for him to improve his performance. Furthermore, it is evident that a tentative conclusion subject to revision based on *future* performance differs in character from an employment conclusion subject to appeal on the basis of a record of *previous* performance as in *Ricks*.

It is also significant that Fisher's written reduction policy was not in effect when Colgan received his performance evaluation. The reduction policy clearly provided that employees who had received performance ratings less favorable than 3 would be selected first for termination in reductions in force so that an employee with such a rating who was aware of the reduction policy would have notice that he or she would be discharged first in the event of a reduction in force. Thus, if the reduction policy had been adopted and published to the employees prior to the 60 to 90 days given Colgan for improvement of his performance, he would have been vulnerable to discharge and he would or at least should have been aware of his jeopardy when he received the evaluation. The record reveals, however, that Fisher adopted the written reduction policy months after Colgan's performance evaluation. Therefore, when Colgan received his poor evaluation, it did not put him on formal notice that it would make him one of the first to be discharged when the company later decided on the reduction in force.[9] We therefore conclude in this case, consid-

ering the totality of the circumstances, in particular the tentative nature of the evaluation and the lack of evidence showing Colgan, when evaluated, knew or had reason to anticipate his vulnerability to discharge, that Fisher's allegedly discriminatory employment practice did not trigger the start of the limitations period.

We realize that our result does not provide what we referred to in *Ricks* as a "bright line guide" to the limitations problem. *Ricks v. Delaware State College*, 605 F.2d 710, 712 (3d Cir.1979). But we were, after all, reversed in *Ricks*, and the Supreme Court in its opinion pointed out that "[c]omplaints that employment termination resulted from discrimination can present widely varying circumstances," an observation which not surprisingly led it to indicate that "[t]he application of the general principles discussed herein necessarily must be made on a case-by-case basis." *Ricks*, 449 U.S. at 258 n. 9, 101 S.Ct. at 504 n. 9. Thus, while without a doubt it is desirable to have definitive limitation rules, we must necessarily confine our opinion to the facts before us and cannot announce a broad rule. In short, we are informed by our experience in *Ricks*.

In reaching our result we have taken careful note of the EEOC's position that the statute of limitations should not run merely because of an evaluation absent a final employment action, which includes, *inter alia*, terminations, transfers, distribution of benefits, or other employee perquisites.[10] The obvious policy supporting

---

9. We find it unnecessary to determine when Colgan obtained knowledge of the written reduction policy because both the date of Fisher's adoption of the reduction policy and the date of Colgan's discharge fell within 300 days of his EEOC filing. We realize that Fisher contends that the written policy merely "memorialized Fisher's actual prior practice with regard to categories of persons who would be affected by a reduction in force." But this cannot change our result because Fisher points to nothing in the record which would support a conclusion that Colgan knew or should have known of its prior practice and Colgan does not acknowledge that he was aware of that practice. Indeed, in his brief he asserts that at the time of the performance evaluation Fisher "had no policy which required that employees receiving performance appraisals like [his] would be among

the first to be terminated" and that he was not required "to make predictions about employment policies that do not even exist." We are *not foreclosing the possibility that on further proceedings on remand Fisher may establish that at the time of the evaluation it had an unwritten reduction policy sufficiently definite to establish that Colgan was or should have been aware of it when he received his evaluation, thus triggering the start of the limitations period.*

10. It does indicate, however, that a negative evaluation may "effect [*sic*] a term or condition of employment sufficient in some circumstances to give rise to a viable claim of discrimination," citing *Smith v. Secretary of Navy*, 659 F.2d 1113, 1114–15 (D.C.Cir.1981).

the EEOC's view is that a tentative action is still subject to correction or adjustment and the employee should have the opportunity to work toward this end. In fact, the final action standard proposed by the EEOC seems consistent with the Supreme Court's holding in *Ricks* that the notification of the employee's inevitable discharge triggered the limitations period, notwithstanding his pending grievance, because the employer had established its *official position* and the grievance did not render the employer's action tentative nor could the employee do anything to change it. *Ricks*, 449 U.S. at 261, 101 S.Ct. at 505–06.

EEOC notes that a standard requiring the filing of a charge in less conclusive circumstances would invite the filing of protective charges by an employee not satisfied with a performance evaluation. It points out, because of the nature of performance evaluations, that such a standard could cause a perpetual and widespread problem. We agree that reading the ADEA to require an employee to file a discrimination charge simply because he has received an evaluation less favorable than the employee thinks justified could unnecessarily cause friction in the employment relationship. We also point out that as events unfold even a favorable evaluation might not be sufficient to save an employee from adverse consequences. Thus, an employee rated, "very good" might be passed over for promotion in favor of an employee rated "excellent." Furthermore, we think that it would be difficult if not impossible to draw a line at which an evaluation is deemed so negative that a charge must then be filed. Accordingly, the EEOC position has much to commend it, as it would relieve employees from having to launch preemptive strikes to preserve their ADEA rights. Nonetheless, in light of our conclusion that Colgan's performance evaluation in the circumstances of this case did not cause harm sufficient to put him on notice that he should file

charges, bearing in mind the Supreme Court's cautionary warning in *Ricks* about case-by-case adjudication, we need not go so far as to hold that a performance evaluation can never trigger the limitations period without final employment action.[11] We only hold that here it did not.

Finally on the timeliness issue, we recognize that any limitation analysis reflects a "value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Ricks*, 449 U.S. at 260, 101 S.Ct. at 505 (quoting *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 463, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1973)). We strike this balance in favor of permitting employees to remedy tentative employment actions by their job performances. Notably, our holding here does not run afoul of the Supreme Court's warning in *Lorance* that allowing a delayed challenge might disrupt the valid reliance interests of co-workers as we cannot equate an individual performance evaluation to a seniority system for this purpose. We think it would be fanciful to hold that a particular employee could legitimately anticipate favorable employment action because of the happenstance that another employee had been unfavorably evaluated. In any event, even if in some circumstances one employee could rely on the negative evaluation of another, surely that should not be so if the evaluation is, as here, tentative or subject to revision. In sum, we cannot, on this record, say that Colgan's charge was untimely. Therefore, the district court erred in granting summary judgment for Fisher on this issue.

### C. *Pretext*

■ The district court held that the merits disposition turns on the third stage of the analytical framework of an ADEA case and we agree.[12] *Colgan*, 747 F.Supp. at

---

**11.** While we appreciate having the view of the EEOC, we need not defer to it, particularly in this case involving the application of the ADEA to a unique set of circumstances. *See EEOC v.*

*Arabian American Oil Co.*, —— U.S. ——, 111 S.Ct. 1227, 1235, 113 L.Ed.2d 274 (1991).

**12.** The district court indicated:

303. Colgan established his prima facie case and Fisher articulated a legitimate, nondiscriminatory reason for its treatment of him. Thus, it was Colgan's obligation to demonstrate that he could prove that the allegedly legitimate reasons proffered for his treatment were only a pretext for discrimination. *See Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Here, of course, the pretext issue related not to the discharge but to the evaluation. Thus, we must determine if there is a genuine issue of fact on the question of whether the evaluation represented Fisher's legitimate assessment of Colgan, free from a discriminatory animus based on his age. We hold that there is such a question of fact as there were circumstances from which an inference of discrimination could be drawn.

The most compelling circumstantial evidence that Fisher discriminated against Colgan on the basis of age is that the August 1986 performance evaluation was his first after he declined the offer of early retirement in January 1986, and that in August 1986 he received a poor performance rating that was aberrational as compared to his earlier ratings. The facts viewed in the light most favorable to Colgan suggest that Fisher was retaliating against Colgan because he would not retire early. Here, after many years of service with consistently good evaluations, Colgan declined to take early retirement. Then, at the very next review period, after he was given substantial additional responsibilities and then a surprise, premature evaluation, he received a performance evaluation substantially less favorable than any evaluation he had previously received. Furthermore, the evaluation gave him the worst overall performance rating for any employee ever seen by the human resources man-

ager and, at the direction of upper level management, was made less favorable than that originally given by the direct supervisor. While the mere offer of an early retirement program does not support an inference of discrimination, *see, e.g., Gray*, 792 F.2d at 255, an employer's *retaliation* against an employee who declines to accept the offer clearly can be an act of age discrimination, and on the record before us we simply cannot understand how on a summary judgment motion we can rule that an inference of retaliation cannot be drawn.

Additionally, the affidavits of Colgan's co-workers, rejected by the district court, support an inference of discrimination. While the district court considered that these persons could not assess Colgan's performance in light of management's objectives, *Colgan*, 747 F.Supp. at 304, the affidavits did raise a genuine issue of material fact as to the reason for Colgan's poor performance evaluation. Parow and Hundley both said that Colgan would not implement the Kaelin program; however, employees present in the machine shop, particularly Harry Walker, stated that Colgan did implement it and worked to meet its production schedules. This information goes to whether his poor evaluation to the extent it was predicated on his refusal to implement the program was a pretext for age discrimination. Taking this information in the light most favorable to Colgan, as we are required to do, there surely is a basis to infer pretext.[13]

Additionally, the report of Colgan's personnel expert, Jarrell, supported an inference of discrimination. The district court rejected it because it regarded Jarrell's conclusion that the discharge was discriminatory as "speculative." *Colgan*, 747 F.Supp. at 304. But Jarrell's conclusion

---

The first two stages of that framework, [Colgan's] prima facie case and [Fisher's] articulation of a legitimate non-discriminatory reason for its employment decision, are not at issue in this case. Rather, the sticking point in this case is the third stage of the prima facie case, *i.e.*, [Colgan's] ability to prove by a preponderance of the evidence that the reasons articulated by [Fisher] are not the true reasons.

747 F.Supp. at 303.

**13.** We do not suggest that if the trier of the fact concludes that Fisher's assessment was wrong it should find age discrimination. Certainly an employer may make an evaluation in good faith with no intent to discriminate even if the trier of the fact disagrees with that evaluation.

was based on Fisher's employment manuals and his report concluded that Fisher breached its standard procedures when it evaluated Colgan's performance, and thus it can reasonably be inferred from Jarrell's analysis that Colgan's untypical evaluation was the product of age discrimination.[14] The district court's determination that the expert did not have personal knowledge of Fisher's procedures imposed an "eyewitness" requirement not demanded of expert witnesses. *See Monks v. General Electric Co.*, 919 F.2d 1189, 1192 (6th Cir. 1990).[15] Certainly, even without the expert's testimony, the employment manuals raise an issue of material fact as to whether Colgan's discharge was in violation of company policy. Furthermore, the circumstance that Colgan did not receive the indicated 60 to 90–day re-evaluation could permit the trier of the fact to infer that management willfully orchestrated the sequence of events.

The district court cited case law for the premise that the circumstance that a poor performance evaluation follows good evaluations, standing alone, cannot give rise to an inference of discrimination in the rendering of the poor evaluation. *Colgan*, 747 F.Supp. at 304. But, the poor evaluation did not stand alone until the district court unjustifiably dismissed the rest of the evidence supporting the inference of pretext.

The district court did not view the facts in the light most favorable to Colgan and, therefore, did not apply the proper standard on a motion for summary judgment when it determined that he offered no evidence of pretext.[16] Accordingly, we will vacate the summary judgment to the extent it was based on this determination.[17]

## D. *Willful Violation*

Fisher contends that this court should affirm the district court's grant of summary judgment on the issue of willfulness even though it decided the case without expressing any opinion on the willfulness count.[18] We have previously determined that willfulness is not shown simply because the employer knew or should have known that its conduct violated the ADEA. Rather "there must be some additional evidence of outrageous conduct." *Dreyer v. ARCO Chemical Co.*, 801 F.2d 651, 658 (3d Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987). We have, however, rejected the premise that willfulness is merely a quantitative standard; in fact, a single act "if it meets the qualitative standard could show both intentional age discrimination and willfulness." *Kelly v. Matlack, Inc.*, 903 F.2d 978, 982 (3d Cir.1990).

---

**14.** In addition to discovery materials Jarrell reviewed Fisher's *Manual of Personnel Policies, Practices and Procedures*, Colgan's performance evaluations from 1975 through 1986, and the personnel manuals of Fisher's parent company.

**15.** The district court in rejecting Jarrell's affidavit cited Fed.R.Civ.P. 56(e), which provides that affidavits shall be made on "personal knowledge" setting forth "facts as would be admissible in evidence." That citation was appropriate as far as it went, but was not in itself determinative as it should have been considered in tandem with Fed.R.Evid. 703 which permits an expert to base an opinion on facts or data "made known to the expert at or before the hearing." The cases on which the district court relied did not involve expert testimony. *See Hurd v. Williams*, 755 F.2d 306, 308 (3d Cir. 1985); *Carey v. Beans*, 500 F.Supp. 580, 583 (E.D.Pa.1980), *aff'd*, 659 F.2d 1065 (3d Cir.1981).

**16.** We realize, of course, that the record does not compel a conclusion that Colgan was the victim of age discrimination. But in view of the

procedural posture of this case we find it unnecessary to detail all the evidence as we surely will not engage in a factual weighing process on an appeal from a summary judgment. We do, however, observe that Fisher for the most part seems to focus its factual argument on the legitimacy of the reduction in force. That matter, however, is not actually in issue as the reduction in force is significant only insofar as it has bearing on Colgan's obligation to file charges under the ADEA. As we have indicated, we do not understand Colgan to urge that if the evaluation was not pretextual he can prevail on the merits.

**17.** Colgan asserts that the district court was precluded from reconsidering its initial denial of summary judgment as the original denial became the law of the case. In view of our conclusions this point is moot.

**18.** This is certainly understandable as Colgan could not establish willfulness if he could not prove that there had been an unlawful practice.

Colgan contends that (1) the aberrational performance evaluation in which he received the worst rating ever given, when considered in light of his long-time employment and outstanding record, and that (2) no effort was made by Fisher to resolve his employment problems support a finding of outrageousness. We decline to consider these arguments, however, because the district court has not yet considered them though it may, of course, do so on remand.

## III. CONCLUSION

In view of the foregoing we will vacate the order for summary judgment of August 29, 1990, in favor of Fisher. However, we are reluctant to make a definitive determination that the action is timely because the case was decided in the district court without a cross-motion for summary judgment by Colgan. While we have been unable to identify any material fact in issue on the timeliness point we think that we should not preclude Fisher from bringing facts to the attention of the district court that as of yet do not appear in the record.[19] Thus, we will not at this time make a final disposition on the timeliness issue and, instead, will only vacate the summary judgment on the point. *Compare Beck v. Reliance Steel Products Co.*, 860 F.2d 576, 581 (3d Cir.1988); *First Nat'l Bank v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 281–82 (3d Cir.1987). Furthermore, we will vacate the summary judgment to the extent that it was predicated on the merits of the case. Finally, we will remand the matter to the district court for further proceedings consistent with this opinion.

COWEN, Circuit Judge, dissenting.

Today this Court holds that the limitations period for filing a complaint of age discrimination with the Equal Employment Opportunity Commission ("EEOC") under the Age Discrimination in Employment Act ("ADEA") did not begin to run when an employee received a negative performance evaluation because the employer failed to show that the employee was or should have been aware of its policy whereby employees with poor performance ratings would be discharged first during reductions in force, and because the evaluation stated the employee would be re-evaluated at a later date. Because I disagree that the limitations period commences only if a purportedly discriminatory performance evaluation has an immediate consequence or the employee is actually aware it has rendered him vulnerable to termination, I respectfully dissent. I would hold that receipt of a purportedly discriminatory performance evaluation is sufficient to start the ADEA limitations period if a reasonable employee would be aware that the evaluation potentially could have some significant detrimental impact on his employment status. I would also establish a standard for determining when the ADEA limitations period begins to run that would provide some practical guidance to future inquiries.[1]

### I.

I dissent from the majority's determination that the ADEA limitations period did not begin to run when the unlawful employment practice occurred, namely when Colgan was given the negative performance evaluation that he believed to be motivated by his age, because it strays too far from Supreme Court precedent and the statute itself. The ADEA requires an employee to file a complaint with the EEOC within 300 days *of the unlawful practice.* 29 U.S.C. § 626(d) (emphasis added). The Supreme Court has emphasized that the proper focus for determining the beginning

---

**19.** *See* in particular footnote 9, *supra.*

**1.** In addition to holding that the evaluation did not trigger the limitations period in this case, the Court holds that the applicable limitations period was 300 days under 29 U.S.C. § 626(d)(1) and 29 U.S.C. § 633(b), by virtue of the fact that Pennsylvania provides a state cause of action for age discrimination in employment. I concur with the majority's determination regarding the length of the limitations period.

The majority also considered the merits of Colgan's claim, and reversed summary judgment in favor of Fisher Scientific. Because I would hold that Colgan's claim is time-barred, I would have affirmed the summary judgment in favor of Fisher Scientific and would not have reached the merits.

of the limitations period is the discriminatory act, not its consequences. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (declining to characterize the effects of the past discriminatory practice as a "continuing violation" and refusing to give the effects of the past practice independent present status for purposes of the limitations period); *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504 ("[t]he proper focus is upon the time of the *discriminatory act,* not upon the time at which the *consequences* of the act become most painful.") (quoting *Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir.1979)); *Lorance v. AT & T Technologies*, 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989) (violation occurred when seniority system adopted, not when plaintiffs were actually demoted under it). As the majority points out, these cases can be distinguished on the basis of their facts. They nonetheless provide guidance that this Court should not ignore.

Here there is no dispute that the purportedly unlawful practice was the evaluation Colgan received in August of 1986. I agree with the majority's position that the limitations period in 29 U.S.C. § 626(d) begins to run when the unlawful practice occurs only if the employee has some sort of notice that the practice could affect him. It would be patently unfair to require an employee to file a complaint about a practice which he has no idea would hurt his employment status. By holding that the limitations period is not triggered by a negative evaluation where it does not have immediate consequences or the employee is not actually aware of an explicit company policy under which the evaluation could cause him to be discharged, however, the majority expands the notice requirement too far. The court holds, in effect, that the receipt of an unlawful employment evaluation does not commence the limitations period unless the employee knows or should know he *definitely* will be harmed.

In so holding the majority disregards the essence of the Supreme Court's most recent case in the area. The Court in *Lorance* explicitly held that the discriminatory act need not impose an inevitable harm on the employee in order to start the limitations period. To illustrate that the mere possibility of future harm is sufficiently concrete to trigger the limitations period, the Court analogized the harm caused by an unlawful seniority system to the harm caused by an accident insurance policy with less coverage than bargained for. *Id.* at 907 n. 3, 109 S.Ct. at 2266 n. 3. The Court noted that the insured is harmed upon receipt of the policy with insufficient coverage, despite the fact that there is only a possibility he will actually file a claim under the policy. *Id.* Requiring that an employee know he will actually be terminated during a reduction in force is like requiring an insured to know he will actually need to file a claim under his insurance policy.

The majority attempts to distinguish this case from *Lorance* by arguing that the potential harm from the imposition of a discriminatory seniority system is more concrete than the potential harm from a negative performance evaluation. The Court concludes that the adoption of a seniority system fixes an employee's rights vis-a-vis his co-workers, but a performance evaluation does not. Maj. op. at 1419. This conclusion ignores the function performance evaluations serve in the work place. Employers use these evaluations to compare employees in order to make decisions regarding promotion, demotion, and termination. Performance evaluations do, therefore, fix an employee's rights vis-a-vis his co-workers.

The majority also attaches great significance to the fact that the evaluation indicated Colgan would be re-evaluated in sixty to ninety days, finding that Colgan could not have known that negative consequences might flow from the evaluation before he had an opportunity to improve his performance. Maj. op. at 1419–20. This finding would be warranted only if the record showed that the negative evaluation would be expunged from Colgan's personnel file if he had improved his performance. To the contrary, however, the negative August 1986 evaluation would have remained part of Colgan's personnel file, even if he

had been re-evaluated and had not been discharged in December of 1986. The possibility that it would eventually cause him to be denied promotion, demoted or terminated would not have been eliminated by a subsequent positive evaluation.

By holding that the limitations period did not commence because Colgan was unaware of the actual consequences that would flow from the evaluation, the majority ignores the fact that Colgan had a cause of action under the ADEA based on the purportedly unlawful evaluation itself at the time he received it. The ADEA prohibits discriminatory practices that could merely "affect an individual's status as an employee," as well as final employment actions. *See* 29 U.S.C. § 623(a)(2). Courts have explicitly recognized an employee's cause of action for a discriminatory performance evaluation. *See, e.g., Smith v. Secretary of Navy,* 659 F.2d 1113 (D.C.Cir. 1981) (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.,* creates a cause of action on behalf of an employee who receives a discriminatory job performance evaluation, but who cannot demonstrate that the evaluation caused him to be denied a specific job or promotion). The appropriate relief in such an action is expungement of the evaluation from the employee's personnel file. In tying the beginning of the limitations period to notice of final employment action, the majority seems to assume that potential discharge is the only actionable consequence of a negative evaluation, and ignores the fact the ADEA creates a cause of action for other, non-final discriminatory practices.

## II.

Today's decision adds nothing of practical significance to future determinations regarding the parameters of the ADEA limitations period. The Court strictly limits its holding to the case *sub judice,* giving no indication as to how concrete the potential harm from a performance evaluation would have to be in order to trigger the limitations period. It explains its failure to provide any future guidance by the Supreme Court's admonition in *Ricks* that, because complaints regarding employment discrimination arise in circumstances that vary widely, the determination regarding when the limitations period begins to run must be made on a case-by-case basis. Maj. op. at 1421. That the inquiry is necessarily fact-specific, however, does not mean that there can be no standards to guide it.

Following *Lorance*'s holding that an unlawful employment practice can commence the limitations period even if it only causes some potential future harm, I would adopt a "reasonable employee" standard for determining whether a negative performance evaluation starts the limitations period. Specifically, the time during which an employee must file a complaint with the EEOC pursuant to 29 U.S.C. § 626(d) would begin when the employee receives an evaluation he suspects to have been motivated by his age, if that evaluation is such that a reasonable employee would know that it could have some significant detrimental impact on his employment status. I emphasize that this standard would tie the commencement of the limitations period to a reasonable employee's knowledge *at the time he receives the evaluation.* The running of the limitations period could not be tied to an event that threatened an employee's status only in hindsight. Employers could not be permitted to conceal potential harm from discriminatory acts and then be shielded from suit by their subterfuge.

In considering whether a reasonable employee would have known that a performance evaluation could have a detrimental impact, the trier of fact would consider at least three factors.[2] The first is the likelihood that the evaluation will remain part of the employee's employment record for an extended period of time. Obviously, written evaluations have more permanency than oral evaluations, but it is possible for oral evaluations to remain part of an em-

---

**2.** These are the factors that I believe to be relevant in this case. Of course, different factors may be implicated in different situations.

ployee's record for some time as well. Secondly, the formality of the evaluation would be considered. Evaluations issued as part of a company's formal evaluation procedure reflect a greater amount of deliberation by the employer and may have a greater impact on the employee's status than would extemporaneous comments. Finally, the trier of fact would consider how negative the evaluation was. An employee who receives a rating that is well-below average is more likely to be aware of a potential negative impact on his employment status than an employee who is accustomed to receiving ratings of "excellent" and suddenly receives a rating of merely "very good."

Applying this standard here, I would hold that Colgan's action is time-barred by virtue of his failure to file an EEOC complaint within 300 days of receiving the purportedly discriminatory evaluation.[3] Viewing the evidence most favorably to Colgan, there is no issue of material fact as to whether he should have been aware that his last performance evaluation could have had a detrimental impact on his employment status.

The record before the Court unquestionably establishes that Colgan should have known that this evaluation might harm him on the day he received it. The evaluation was formal and written. That it was also extraordinarily negative is illustrated by the testimony of one of Fisher's supervisors to the effect that Colgan's August 1986 evaluation was the worst he had ever seen. The evaluation even specified that Colgan could be demoted, reassigned, or separated from the company if he did not

improve.[4] In reaching its decision, the majority relies on the fact that Fisher failed to show that Colgan should have been aware of the specific policy whereby employees with poor performance records were discharged first during reductions in force. This fact should not be dispositive. Even if Colgan was unaware of this explicit policy, any reasonable employee in his situation would have known that a negative performance rating harms his status. The results of this harm could range from potential discharge to not receiving a promotion.

Moreover, the record indisputably indicates that Colgan was, in fact, aware that the August 1986 evaluation could hurt him. Colgan appealed that evaluation through the intra-company performance evaluation appeal process. He would not have bothered to appeal the evaluation if he did not believe that it might hurt his employment status.

### III.

Finally, I turn to the majority's contention that requiring an employee to file a complaint with the EEOC upon receipt of an evaluation he suspects to be discriminatory would have a disruptive impact on the work place. Our reversal by the Supreme Court in *Ricks* indicates that concerns of potential work place disruption from requiring early EEOC filings should not affect the limitations period analysis. In *Ricks*, this Court had held that the limitations period began to run when the plaintiff's employment was terminated, based partially on the rationale that requiring a complaint to be filed earlier would cause the following result: "[w]orking relation-

---

**3.** If the Court had adopted the standard I propose for determining when the limitations period began to run, it would have had to address Colgan's contention that the standard should not be applied retroactively in this action on the basis of equitable considerations. I do not believe Colgan can overcome the strong presumption in favor of retroactive application of newly announced rules (*see Gruber v. Price Waterhouse*, 911 F.2d 960, 965 (3d Cir.1990)), but it would serve no purpose here for me to delineate the reasons why this is so.

**4.** The majority contends that it would be "impossible to draw a line at which an evaluation is deemed so negative that a charge must then be filed." Maj. op. at 1421. Under the "reasonable employee" standard I propose, no precise line need be drawn. In this particular case, the evaluation was so negative that no reasonable employee could have failed to realize that it might have negative consequences.

**1428**

ships will be injured, if not sundered, and the litigation process will divert attention from the proper fulfillment of job responsibilities." 449 U.S. at 256, 101 S.Ct. at 503 (quoting *Ricks v. Delaware State College,* 605 F.2d 710, 712 (3d Cir.1979)). By reversing our holding in *Ricks,* the Supreme Court rejected this rationale.

While it may ease the EEOC's workload by limiting the number of filings, today's holding needlessly introduces another type of disruption into the work place—uncertainty. The Court has effectively given an employee who receives a negative performance evaluation with the understanding that he will be re-evaluated at a later date and at a time when his employer cannot show he should have known that he could be discharged because of that evaluation, the ability to file suit for any negative consequences of that evaluation at any time during his employment relationship, no matter how far in the future those results occur. The Court has removed all restraints on the time during which the employer can he dragged into court under the ADEA for consequences that might ensue from an evaluation given to an employee over the age of forty under conditions similar to those *sub judice.* In so doing, the Court has not only ignored the Supreme Court's refusal to recognize a "continuing violation" theory in *Evans, Ricks,* and *Lorance,* but it has rendered the ADEA limitations period meaningless in such situations by enabling employees to completely circumvent it. I must, therefore, dissent from today's decision.