Lewis H. BILLET, Jr., Appellant,

v.

CIGNA CORPORATION; and Connecticut General Life Insurance Company.

No. 90–1918.

United States Court of Appeals, Third Circuit.

Argued June 4, 1991.

Decided July 25, 1991.

Rehearing Denied Aug. 20, 1991.

Walter M. Phillips, Jr. (argued), Phillips and Phelan, Philadelphia, Pa., for appellant.

Stephanie A. Middleton (argued), Philadelphia, Pa., for appellees.

Before SLOVITER, Chief Judge, and GREENBERG and WEIS, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This is an appeal from an order of November 16, 1990, granting a directed verdict for the employer in an action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. The ac-

tion was brought by Lewis H. Billet, Jr., a former sales manager or director of Connecticut General Life Insurance Company, following his termination as part of a management level reorganization consolidating high-level management positions. After the jury was unable to reach a verdict, the district court granted a motion for directed verdict in favor of Connecticut General on which it had reserved decision. The district court held that there was not "enough evidence in this case for a jury to make a finding of pretext," referring to Connecticut General's articulated business reasons for terminating Billet. We conclude that Billet failed to cast legally sufficient doubt on these articulated reasons to survive the motion for a directed verdict and therefore we will affirm the district court's order.

## I. BACKGROUND

Billet joined Connecticut General in 1955.[1] He continued to be employed there until November 1, 1988, when he was advised that his position as sales manager for the Philadelphia group sales office was being eliminated and that his employment would be terminated effective January 31, 1989. At the date of his termination, Billet was 55 years old.

On August 16, 1989, Billet filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on age. This charge was referred to the Pennsylvania Human Relations Commission for the purpose of dual filing.[2] In response, Connecticut General articulated numerous reasons for terminating Billet, including a poor evaluation of him, his forging of a supervisor's signature, his interrupting a sales staff meeting, and his disregard for company policy and procedure. On December 18, 1989, more than 60 days after his EEOC filing, Billet

1. Connecticut General is a subsidiary of CIGNA Corporation. Billet originally named CIGNA as an additional defendant but, on February 5, 1990, he stipulated to the dismissal of the action as to it.

2. This filing was timely when measured from November 1, 1989, since Pennsylvania is a de-

ferral state in which the complainant has 300 days to file an ADEA charge. *See Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1413–15 (3d Cir.1991); *Davis v. Calgon Corp.,* 627 F.2d 674, 677 (3d Cir.1980) (per curiam), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981).

commenced the present action in the district court, alleging that he was terminated because of his age in violation of the ADEA.

Connecticut General moved for summary judgment and as a portion of his response Billet filed an affidavit of his co-worker, Andrew Baker, also a former sales manager in the Philadelphia office. The motion for summary judgment was denied but Connecticut General, anticipating that Baker would be called as a witness at trial, then filed a motion *in limine* seeking to limit his testimony. The trial started on November 5, 1990, and when Billet called Baker as a witness, Connecticut General reminded the court of its outstanding *in limine* motion. The court stated that Baker could testify only about work he did directly with Billet and it later sustained objections by Connecticut General to certain questions asked Baker.

Connecticut General moved for a directed verdict at the close of Billet's case and the district court took this motion under advisement. Connecticut General then presented evidence and again moved for a directed verdict at the conclusion of all of the evidence but the court also reserved decision on this motion. Connecticut General argued that it was entitled to a directed verdict, as Billet had failed to present evidence sufficient to challenge its articulated reasons for his termination.

On November 15, 1990, the district court submitted the case to the jury, though it refused to allow the jury to consider the issue of whether Connecticut General's conduct was "willful" under the ADEA, warranting liquidated damages. On November 16, 1990, the jury reported that it was deadlocked and unable to return a verdict in favor of either party. At that time, Billet moved, pursuant to Fed.R. Civ.P. 48 for a majority verdict, which requires the consent of both parties. Connecticut General refused and the jury was discharged.

Immediately thereafter, the district court granted Connecticut General's motion for a directed verdict made at the close of all the evidence, stating that there was not enough evidence for a jury to find pretext. On November 16, 1990, the district court issued an order directing a verdict in favor of Connecticut General and entered judgment thereon. This appeal followed. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, and we have jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

Billet first claims that the district court erred in granting Connecticut General's motion for a directed verdict. Second, he argues that the district court erred in precluding the jury from considering the issue of willfulness. Third, he contends that the district court erred in sustaining Connecticut General's objections to certain questions asked Baker. We consider the claims of errors *seriatim* and we reject each.

### A. *Grant of the Directed Verdict*

█ Our review of the grant of a directed verdict is plenary and thus we apply the same standard as did the district court. *Gay v. Petsock*, 917 F.2d 768, 771 (3d Cir. 1990). Accordingly, we may affirm the order for the directed verdict only if there was insufficient evidence from which the jury could reasonably have found for Billet, as the nonmoving party, and we must view that evidence in a light favorable to Billet and draw all reasonable inferences in his favor. *Id.* In particular, as applied in this ADEA disparate treatment case, this standard requires that we affirm if there is not "substantial evidence in the record to support the plaintiff's contention that 'but for' his age he would not have been discharged." *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 546 (7th Cir.1988), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3191, 105 L.Ed.2d 699 (1989). *See also Healy v. New York Life Insurance Co.*, 860 F.2d 1209, 1219 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989) (affirming a summary judgment for the defendant-employer, stating that the plaintiff had not presented the court with a genuine issue of material fact as to whether "but for" his age he would not have been discharged). We must take the

record as a whole and determine whether a rational trier of fact could have found for Billet. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The ADEA proscribes discrimination against an individual over age 40 with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a); *see id.* § 631. To recover in an age discrimination suit, "a plaintiff must prove by a preponderance of the evidence that age was the determinative factor in the employer's decision" at issue. *Bartek v. Urban Redevelopment Authority of Pittsburgh*, 882 F.2d 739, 742 (3d Cir.1989). Though the plaintiff has the ultimate burden to prove that age was a determinative factor, he does not have to prove that age was the sole or exclusive reason, but rather that "age made a difference" in the employer's decision. *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1395 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

Under the ADEA, a plaintiff must first prove a *prima facie* case of discrimination but this can be done with either direct or circumstantial evidence.[3] *Maxfield v. Sinclair International*, 766 F.2d 788, 791 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). If the plaintiff establishes his *prima facie* case, an inference of unlawful discrimination arises. The burden then shifts to the defendant employer who can dispel the inference of discrimination by articulating a legitimate, nondiscriminatory reason for the plaintiff's discharge. If the defendant meets this burden of production of evidence, the plaintiff must prove by a preponderance of the evidence that the articulated reasons are a pretext for discrimi-

nation. *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 764 (3d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 880, 107 L.Ed.2d 962 (1990). The plaintiff can prove pretext directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Fowle v. C & C Cola*, 868 F.2d 59, 62 (3d Cir.1989). *See also Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898 (3d Cir.) (in banc), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987) (indirect evidence can establish pretext). However, this indirect evidence must be enough to support a *reasonable* inference that the reasons given for the employment decision are pretextual. Merely reciting that age was the reason for the decision does not make it so. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (conclusory allegations of discrimination are insufficient to satisfy the requirements of Fed.R.Civ.P. 56(e)). *See also Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356 (in response to summary judgment or directed verdict motion, the nonmoving party must show more than that there is some "metaphysical doubt" as to the material facts).

Thus we, along with numerous other courts, have stated that summary dispositions can be applicable in employment age discrimination cases. *Healy*, 860 F.2d at 1219 (only when the plaintiff proffers evidence of pretext and a genuine issue of fact exists as to defendant's articulated reasons is summary judgment foreclosed). *See also Smith v. Goodyear*, 895 F.2d 467, 471–72 (8th Cir.1990) (reversing an ADEA jury verdict, explaining, "the jury could rationally have believed that plaintiff[ ] ought in good conscience have been permitted to stay ..., but there is absolutely no

---

**3.** In the absence of direct evidence a plaintiff may establish a *prima facie* case of discrimination by proving by a preponderance of the evidence that he (1) belongs to a protected class; (2) was qualified for the position; (3) was dismissed despite being qualified; and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination. *See Maxfield v. Sinclair International,*

766 F.2d at 792. In a case such as this, where the plaintiff's job was eliminated and he was not replaced, to establish a *prima facie* case, he need only show that he is within the protected class, and was qualified for the job from which he was laid off while other workers not in the protected class were retained. *Turner v. Schering-Plough Corp,* 901 F.2d 335, 342 (3d Cir. 1990).

substantial evidence in this record that would justify attributing [the employer's] actions to plaintiff['s] age.... This court will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives." (citations omitted)); *Carter v. City of Miami,* 870 F.2d 578, 584 (11th Cir.1989) (reversing an ADEA jury verdict and holding that the trial court should have granted a directed verdict where the employer rebutted the *prima facie* case with evidence of disruptive behavior by and complaints about the plaintiff); *Lucas v. Dover Corp.,* 857 F.2d 1397, 1403 (10th Cir.1988) (in affirming a judgment notwithstanding the verdict for the employer, the court stated, "[i]n short, while plaintiffs may disagree with [the employer's] evaluation of who was the best qualified employee to fill the consolidated positions, as long as a jury had no reasonable basis for determining that age was a determining factor in those evaluations, the jury verdict for plaintiffs cannot stand.")

Once a case has been tried to a jury on its merits, it is unnecessary for an appellate court to decide whether a *prima facie* case was established. *Bruno,* 882 F.2d at 764. Rather, the reviewing court considers the ultimate issue of whether the plaintiff proved by a preponderance of the evidence that age was a determinative factor in the employment decision. *Id.*

Although it attempts to dispute whether Billet satisfied his *prima facie* case, Connecticut General acknowledges that since the full case was tried to a jury, the appropriate focus here is on whether Billet submitted sufficient evidence from which a jury, viewing the evidence in a light most favorable to Billet, could find pretext. In light of this, we consider the reasons articulated by Connecticut General for Billet's termination, along with Billet's attempts to refute these reasons, to determine whether a jury could reasonably have found these articulated reasons pretextual, and conclude that there is not sufficient evidence in the record to support Billet's claim that but for his age he would not have been terminated.

In view of the nature of our disposition of the case, we will set forth the evidence at length. Billet joined Connecticut General in 1955 at age 21 selling group indemnity insurance. In 1959, Billet became assistant manager in the Boston office and in 1961 he was promoted to manager of the Cincinnati Group office. In 1966, Billet became sales manager of the Syracuse office, which eventually included all of upstate New York.

In September 1983 Billet became sales manager for the Philadelphia Group Sales office, which almost exclusively sold group indemnity insurance. Between 1984 and 1988, the office twice won a Superior Achievement Award (1984 and 1987), and salespersons in the Philadelphia office often qualified for the Gold Circle, a sales award. In February 1988 Andrew Baker was placed in charge of the pre-paid (*i.e.,* HMO) insurance side of Connecticut General's Philadelphia business.

In 1988, Connecticut General decided to merge its group indemnity product line with its pre-paid health insurance product line and to sell a "managed care" type of insurance, a combination of both indemnity and HMO plans. As part of this reorganization, Connecticut General reduced the number of regions throughout the country from 11 to eight. The Northeast Corridor Region, headquartered in Philadelphia, and the Chesapeake Region, headquartered in Columbia, Maryland, were consolidated into a single region called the East Coast Region, to be headed by a single regional vice president.

The sales manager and regional vice-president positions were affected by this reorganization. The consolidation resulted in the need for only one regional vice president, whereas before both the Northeast and Chesapeake Regions had a vice-president. In addition, since the pre-paid and HMO product lines were merged, only one sales manager was needed in the Philadelphia office, resulting in the elimination of the positions held by Billet and Baker.

In addition to the elimination of one regional vice president and the sales manager positions, a new position of city manager

was created in "merged" cities, such as Philadelphia, to oversee the merged operations. On November 1, 1988, El Kenyon, age 40, who had been regional vice president of the Chesapeake region, was named the new regional vice president for the East Coast Region. Joseph Botta, age 39, who had been regional vice president for the Northeast Corridor region, and who was Billet's immediate supervisor, was named to the city manager position for Philadelphia. Kenyon and Botta had each sought the regional vice president position. Botta resigned from the city manager position in June 1989 and was replaced by Larry Savage, age 43.

Billet was informed by letter on November 1, 1988, that due to the reorganization his position had been eliminated and he would be terminated effective January 31, 1989. The same day, Baker, then age 53, Billet's counterpart in the Philadelphia office in that he headed sales of pre-paid plans while Billet headed sales of indemnity plans, was informed that his position as sales manager/director[4] was being eliminated. He was, however, offered the position of associate sales manager/director, reporting to the city manager and he accepted this position. But in January 1989 Baker resigned from Connecticut General.

Prior to the 1988 reorganization, there were two associate sales manager/directors in the Philadelphia office, Vincent Sobocinski, age 34, who reported to Billet, and Virginia Pfeiffer, age 43, who reported to Baker. After the reorganization, Sobocinski became a sales director as did Pfeiffer.[5] Pfeiffer, however, resigned in February 1989 and was replaced in April 1989 by Timothy O'Brien, age 30.

The decision to terminate Billet was made by Edward Parry, Vice President of Sales. According to Parry, the termination was part of a nationwide reorganization and reduction in force (RIF). In this reorganization, sales offices and management positions were combined, resulting in a decrease in the number of jobs at management and regional vice president levels. Parry's decision was approved by James Grigsby, head of sales for the Employee Benefits Division, in which Billet worked.

There is no question that, as a result of the reorganization, the positions held by Botta, Billet and Baker were eliminated and two positions, city manager and associate sales manager, were substituted. Thus, there were three persons vying to fill only two positions. Connecticut General articulated a host of reasons why it was Billet who was terminated. We first set out the undisputed facts regarding these reasons and then address Billet's burden and attempt to prove them pretextual.

1. 1988 Yearly Review

In an interim evaluation for 1988 in July of that year, Botta, who was then Billet's supervisor, and who was making his first evaluation of Billet, gave him an overall score of 4, based on a 1–5 scale, 1 being the highest.[6] As a result of this evaluation, on July 21, 1988, Billet was given a performance warning.

In this review Billet received a 3 in the sales category, a performance described as "poor" or "very poor." In human resources management, Billet received a rating of 5. The review stated that training and attention to integrated product sales education were "virtually non-existent" and that new employees were being trained "'on the job.'" This review also noted that unauthorized quotes were sometimes given out by salespeople and that Billet had inappropriately handled the closing of the Harrisburg office. The review pointed out that Billet was insubordinate and unwilling

---

4. According to Billet, the title sales manager/sales director were used interchangeably.

5. Connecticut General disputes this statement, stating that Sobocinski and Pfeiffer remained in their same jobs, with the same salaries as before the reorganization. Any discrepancy on this point is not material to our decision in this case.

6. The record reflects two interim reviews for the year 1988. The first, dated July 7, 1988, gives an overall rating of 5. This was, however, superseded by a second, dated July 15, 1988, with an overall rating of 4. The July 1988 review was completed four months after Billet's 1987 review, in which he received an overall score of 2.

to take direction from the regional vice-president and noted that he had behaved improperly at a training conference at Southbury, Connecticut. Billet was also criticized for having "only fair relationships" with underwriting. In summarizing the review, Botta noted his "concern" over several specific instances and over Billet's relationship with underwriting and management regarding the integration of product sales.

Pursuant to this performance warning, Billet was put on a 90–day probation during which he was given a list of improvements to make and goals to meet, namely in the areas of human resources management, new sales, relations with the underwriting department and leadership skills. Billet was informed that if, after the probation period, he had not met these goals he would be put on formal probation which could result in his being discharged.

### 2. Car Requisition

Billet was entitled to a company automobile but, as might be expected, Connecticut General had formal requirements before he could obtain one. It is undisputed that in February 1988 Billet received the paperwork required to replace his automobile but that Botta's signature was required for him to obtain it. Billet, however, circumvented this requirement by printing and signing Botta's name on the requisition form, without Botta's permission or knowledge, in direct violation of the caveat on the form with respect to approvals, and directly over the lines for signatures, that "No employees may authorize assignment to themselves." This important requirement was also emphasized in Connecticut General internal memoranda and there is no doubt that Billet was aware of it. Four months later, after Botta discovered that Billet had signed his name to the form, he informed Billet that he had no authority to do so. Botta, however, did not terminate Billet at that time, although under Connecticut General rules the false signature was cause for termination. Instead on July 21, 1988, Billet received a misconduct probation memorandum from Botta, advising him that he had forged Botta's name on the form. There was testimony from Edward Parry, Vice President of Sales, that he interceded on Billet's behalf to prevent Billet's termination over this incident.

### 3. Southbury Incident

At a meeting during a sales training conference in Southbury, Connecticut, in June 1988 words were exchanged between Botta and Billet. Botta subsequently sent a memo to his supervisor, Parry, which described this interruption, explaining that Billet entered the meeting in an intoxicated condition carrying liquor, and acted in an insubordinate way by yelling at Botta and insulting him. Witnesses at the trial testified that there was a disruption at the meeting, though none verified that Billet was intoxicated or insubordinate. Billet testified that the incident occurred and that he interrupted Botta and the two had words, although he denied yelling or being intoxicated. Billet did, however, acknowledge having a decanter of wine but stated that he had not consumed more than two or three glasses of wine.

Botta did not seek to terminate Billet over this incident, although he had the approval of Connecticut General's human resources department to do so. Parry testified that both human resources and James Grigsby, the sales head, sought to terminate Billet over this incident, but that he interceded on Billet's behalf because a misconduct dismissal would have precluded Billet from receiving all benefits to which he would be entitled in a few months' time when he turned 55. In particular, Parry pointed out that if terminated for misconduct in 1988 Billet would have lost about $200,000 in severance pay, health benefits other than having his coverage converted to an individual policy, and vacation day pay. In addition, a misconduct termination would have resulted in Billet's pension being reduced from that ultimately awarded. Parry explained that because of the "very significant financial burden" which would have flowed from a misconduct discharge "in light of his extensive employment record with us [we did] not terminate him."

Instead, Billet was placed on misconduct probation.

Billet's misconduct probation attributable to the automobile requisition and Southbury incidents was unrelated to, and independent of, the performance warning Billet was given pursuant to his July 1988 interim evaluation. The misconduct probation was to last "for the duration of [Billet's] employment with Connecticut General," and thus he was warned that if "either of these two situations or any misconduct situation occurs again, you will be terminated." Billet signed a statement that he understood the terms of the probation.

### 4. Complaints from Underwriting Department

Connecticut General asserted that Billet's department was having problems with the underwriting department which predated his 1988 evaluation. These problems were so serious that underwriting, in Parry's words, had threatened to "pull the plug" on the Philadelphia office and not write any more policies for it, an act which would clearly have had a devastating impact. In support of this claim, Connecticut General cites to the following incidents, the facts of which are not generally disputed.

#### a. *Murray Industries*

In January 1988 Billet's office renewed a contract with Murray Industries without approval of underwriting. Billet testified that this was a mistake on the part of a salesperson under his supervision, but another witness, Michael Ackerman, testified that he was present when Billet told the salesman to renew Murray at a rate lower than that approved by underwriting.

#### b. *Wilco Trading Company*

A policy was sold to Wilco Trading Company at a rate 14% below the authorized rate as a result of the failure of a member of Billet's sales staff, Paul Connolly, to follow rating directions given by underwriting. Instructions with respect to this were included in a June 9, 1988, memorandum but Billet did not distribute the memorandum. In an August 9, 1988, memo Parry chastised Billet for his refusal to accept responsibility for this incident and informed him that neither he nor Connolly would be compensated on this sale. A memo regarding this incident was placed in Billet's file.

#### c. *Riddle Memorial Foundation*

Billet's office sold a group health insurance policy to Riddle Memorial Foundation which required the execution of a supplemental premium agreement. This supplemental agreement was drafted by underwriting, signed by Michael Wilkey, regional director for underwriting, and sent to the Philadelphia office. In processing this matter in the absence of the salesperson involved, Billet made certain changes to the agreement, had the agreement retyped, signed Wilkey's name to it and sent it to Riddle. Subsequently, the salesman, David Johnson, sent two letters without seeking approval from underwriting to Riddle regarding certain points in the agreement. Riddle executed the agreement, incorporating the letters as part of the agreement.

About a year later, Riddle canceled the policy and because of the incorporation of the letters from Johnson avoided a $300,000 cancellation fee. At first, Johnson was placed on probation because of this incident as it was thought that he had signed Wilkey's name to the edited agreement. He was, however, taken off probation when it was learned that it was Billet who signed Wilkey's name.

There were also other incidents which contributed to a strained relationship between the Philadelphia office and the underwriting department. Billet admitted that unauthorized quotes were issued from his office for Spectacor, and that policy and procedures were not followed in connection with transactions involving Silvatrim, Flagship and BPS. Clearly the situation was regarded within Connecticut General as serious for in June 1988 Billet met with Joseph O'Rourke, vice president of underwriting, Meg Woolley, regional director of underwriting, Parry, Botta and Sobocinski to discuss specific cases and concerns.

There was testimony that many of the sales made by the Philadelphia office in 1987, for example the Wilco and Riddle accounts, came back to haunt Connecticut General in 1988. According to Connecticut General, these problems had not surfaced when Billet's supervisor before Botta, James Bell, gave him an overall score of 2 for his first 1988 review. In addition, there was testimony that the Philadelphia office had a "no-quote" rate (*i.e.*, instances where a quote was not received from underwriting) of approximately 32%, whereas the maximum acceptable no-quote level was somewhere around 15%. A no-quote rate is significant because it reflects business which should not have been submitted in the first place, so that it resulted in wasting resources in reviewing it.

### 5. Closing of Harrisburg Office

In March 1988 Botta and Billet were each sent a memo from human resources regarding the procedures to be followed in the impending closing of the Harrisburg, Pennsylvania, satellite office. This procedure included instructions that no employee in the office was to be notified of layoff or closing until the day selected for announcing the closing, May 2, 1988. Billet, however, informed Barbara Tatum, who was in charge of the Harrisburg office, on April 22, 1988, of the closing and he sent her a letter, dated April 29, formally announcing it. A memo was placed in Billet's personnel file in which he was criticized for failing to follow instructions in this matter and for sending Tatum a letter rather than going to Harrisburg on May 2.

### 6. Integration of Indemnity and Pre-Paid Insurance

The reorganization discussed above was intended to integrate Connecticut General's indemnity insurance product with prepaid/HMO insurance products into a "managed care" product. According to Connecticut General, Billet, whose entire career had been spent in the indemnity field, resisted this integration and actually undermined it. Connecticut General regarded Billet as having a low opinion of the prepaid product and of the expertise need-

ed to sell it. Billet often complained about the integration process. Billet admitted that he was aware that the prepaid staff complained about the way it was treated by him and his indemnity staff. James Bell, Billet's supervisor before Botta, testified that he had concerns about Billet's ability to integrate the indemnity and prepaid programs.

### 7. Slotting Forms

In March 1988 Billet was sent slotting forms, to be filled out by him for each of the sales people working for him. It is undisputed that Billet failed to complete a section of the forms, which were also signed by Botta, and the missing information had to be supplied to human resources later by telephone. A memo was placed in Billet's file by Cindy Fox, of human resources, criticizing him for failing to fully complete the forms. According to Billet, these forms were sent by him to Parry and then to Fox, and no mention of any error was made on his part for over four months.

### 8. Deanna Clendennon

In the spring of 1988, Deanna Clendennon, an administrator in the Philadelphia office, made several complaints to the human resources department about instances of humiliation and harassment by Billet. A memo regarding this was placed in Billet's personnel file sometime between March–August of 1988.

### 9. CIGNA Dental Health

Connecticut General offered a dental program, CIGNA dental health ("CDH"), which was sold by the Philadelphia office. There was testimony from Peter Neidlinger, vice-president of national accounts, that CDH was not a high priority for Billet and that Billet gave the impression that Philadelphia had better, more lucrative, sales to make than CDH. The Philadelphia office was identified in a memo from Neidlinger, dated July 8, 1988, as a "problem" office in the sale of CDH. In particular, the memo reflects Neidlinger's findings that there was "no urgency by management to sup-

port/promote product." Neidlinger testified that he did not feel that Billet really encouraged his sales staff to sell CDH, although he acknowledged that there was a bonus available for a sale of CDH.

### 10. Billet's Responses

Billet contends that the evidence he presented regarding his career and performance at Connecticut General, viewed in the light most favorable to him as the nonmoving party, was sufficient to create a jury question as to the validity of Connecticut General's articulated reasons for his termination and that the district court erred in granting the directed verdict motion. Billet's theory is that the proffered reasons for his termination focus on the five-month period between March and August 1988. He claims that Connecticut General rests its employment decisions on this short period, and that it is unreasonable for this court to believe that a 32–year employee, with an outstanding record, suddenly fell apart. Billet claims that the documented criticism of his performance during this period was not made in good faith and was designed for the sole purpose of creating a record to withstand an age discrimination case.

Billet contends that he submitted "abundan[t]" evidence "to show that the criticism of [his] performance ... was spurious and [Connecticut General's] rationale for its treatment of him thus pretextual." According to Billet, Connecticut General's proffered reasons for his termination were "virtually all ... based on events in 1988" which would not hold up to objective review. In essence, Billet urges that his explanation for the numerous events mentioned by Connecticut General for his termination cast doubt on its proffered reasons so as to preclude the grant of the directed verdict by the district court, particularly since Connecticut General's credibility was at issue. Billet specifically addresses each item described above.

Billet asserts that his prior record of good evaluations in Philadelphia supports the inference that the July 1988 interim evaluation was not worthy of credence. In general, Billet had received positive evaluations during his employment in the Philadelphia office. In particular, for the years 1983–88, Billet received the following overall scores on his yearly reviews:

1983—3
1984—1
1985—2
1986—4
1987—2
1988—4

In Billet's review for 1984, his first full year at the Philadelphia office, he received an overall rating of 1. The review sheet notes that in the sales production category, Billet achieved "outstanding" results, in a year of "difficult personnel challenges and turnover."

For 1985, Billet received an overall score of 2. He received a 2 for the individual category of sales, in which his work was called "excellent." The review stated that in the area of human resources management Billet "[c]onsistently does a fine job of coaching and developing people ... to the extent that he now has probably the best crop of young sales people in the company. Bill is extremely conscientious about staff training and always has time for his people."

For 1986, Billet received an overall score of 4. The review indicates that this score was caused primarily by low scores in the area of sales and profitability. In the area of human resources management, Billet received a score of 3. The review notes that "[o]verall, Bill did a good job of keeping his staff in a reasonably positive attitude in spite of very trying market conditions." The review further noted that "[d]evelopment of sales staff was adequate but there are some question marks. The staff is not generally highly regarded by Underwriting, which will continue to be a restraint to future growth unless improvement is evident. This needs to be a high priority for Bill in 1987."

In his 1987 performance appraisal, Billet received an overall score of 2, the review calling his results in sales "outstanding." Under the category of "leadership" it was

noted that Billet "did a good job of providing clear direction to his staff and developing very specific performance expectations," and also that he "provided good development opportunities ... for his staff, and was personally involved in significant amounts of coaching activity." The major criticism of Billet's performance in this evaluation was in the human resources category where it was stated that "Bill is not process oriented, however, and this has hurt his performance in some areas.... In particular, he needs to significantly improve his performance in the completion of performance appraisal documents."

Billet also asserts that at trial he challenged and undermined his superior Botta, showing that Botta's appraisal was subjective and came from a much younger, inexperienced person, who later vied with Billet for the position of city manager and received that position. According to Billet, a month or so before drafting Billet's appraisal, Botta told him he would be a logical candidate for the city manager position. Billet argues that the consideration of him for the city manager position undermines the reasons given for his being passed over for the position and subsequent termination. Billet urges that he would not even have been considered for the position if he were a forger who had been publicly intoxicated and insubordinate and whose relations with human resources were so bad.

Billet asserts that he impeached the factual bases given by Connecticut General for not making him city manager and for his termination. Accordingly, he at least demonstrated that there was a genuine issue of material fact on the pretext issue since the discrediting of Connecticut General's explanation was itself further evidence which could have persuaded a jury that unlawful discrimination occurred. He points to his outstanding 32–year career, including a high review just four months prior to his 1988 review, asserting he "pok[ed] massive holes into Connecticut General's assessment of his performance" thereby calling into question the veracity of its evaluation of him and impugning the proffered reason for his termination. This, in his view, could have led a jury to determine that the proffered reasons were pretextual.

Billet asserts that the probation for the alleged forgery of the automobile requisition form was a "clearly pretextual" excuse for his discharge. In support of this assertion, he claims that "[t]here was no indication of, or reason for, an intent to deceive, a necessary element of the act of forgery," since the automobile requisition had been pre-approved by Botta, whose name Billet signed. According to Billet, the replacement had already been authorized and he was merely completing the paperwork in Botta's absence. Billet further proposes in support of this assertion that "plaintiff's signing his own name right next to Botta's should have dispelled any notion of forgery, since forgers generally do not confess to their crime while [ ] committing it." Finally, Billet contends that for four months Connecticut General found nothing improper in his signing Botta's name. From this, Billet seeks to have us infer that casting blame on him for the forgery is an ad hoc attempt by Connecticut General to validate its otherwise unlawful discharge.

Similarly, Billet claims, the "Riddle forgery" is "just as ridiculous." According to Billet, he never saw the fully executed supplemental agreement nor knew that the letters were sent or incorporated. According to Billet, the salesperson involved in this instance, David Johnson, was not reprimanded for his unauthorized supplementation of the agreement with Riddle, an act which cost Connecticut General hundreds of thousands of dollars. In Billet's view, this tends to prove that his reprimand for signing Wilkey's name is a pretext for the real reason for his termination—age. Billet urges that when it was found that he had signed Wilkey's name, he became branded a "forger" despite the fact others had signed Wilkey's name on other occasions.

Billet, while acknowledging that there was a Southbury incident, urges that the use of it as a reason for his termination was pretextual. According to Billet, it was

unfair for him to have been placed on open-ended probation for this incident, as he was never asked for his version of what happened. Accordingly, a fair-minded jury could have concluded that this probation was harassment, imposed as a subterfuge for the real reason for his termination—his age. Billet also claims that he impeached Botta's version of this incident at trial.

Billet also addresses the specific complaints regarding his relationship with underwriting. He claims that he enjoyed a good relationship with that department throughout his career at Connecticut General and that there was no evidence or documentation, prior to his 1988 evaluation, criticizing his relationship with underwriting. Billet concedes that there was a "fleeting reference" in his 1986 performance evaluation as to how his staff was regarded by underwriting, but contends that any problem was corrected by the following year, when he received a good evaluation. Furthermore, Billet argues that the "few instances" regarding underwriting "represent but a small handful of the total number of new cases sold each year" and that the problems with these cases, e.g., Wilco, Riddle, "generally resulted from a miscommunication between one of Billet's salespeople and the underwriter in question." "The result was that the 1988 underwriting problems were greatly exaggerated and were attributed solely to Billet, never to underwriting, and only parenthetically to Billet's salespeople."

Specifically, as to the problems with underwriting concerning Wilco, Billet asserts that the agent, Paul Connolly, had been advised by underwriting to apply the correct rate. Furthermore, this information was in the system and available to the salespeople, and Billet had informed his sales staff of this fact. Billet argues that these circumstances tend to discredit this incident as a reason for his discharge. Billet also asserts that Connolly was not reprimanded for his error, a fact disputed by Connecticut General in that Connolly was denied compensation for the Wilco sale.

Billet claims that, since Connecticut General could find no cause to criticize his sales record in his 32 years with the company, it harps on his failure to do better in selling the CIGNA dental health program. According to Billet, this program is a hard sell in Philadelphia due to a lack of participating dentists. Furthermore, it was not the responsibility of his office to develop a network of participating dentists and there was testimony from his staff that Billet pushed hard to sell the dental program, including tying a bonus to its sale.

Billet dismisses his violation of the directive regarding the closing of the Harrisburg office, explaining that he owed Tatum early notice since she had worked for him for five years and because he would be out of town on the date scheduled to announce the closing. Furthermore, Billet regarded Botta as ultimately responsible for seeing that the procedures were followed in the closing, and Botta was at the same meeting on May 2 which Billet attended rather than being in Harrisburg, but was not criticized for any role in this incident.

Billet claims that the criticism of him regarding Deanna Clendennon was unfounded since the incident between them involved her concern with his management style. Billet testified that Clendennon and he cleared up any problems they had and remained friends even after he left Connecticut General and he points out that no mention of this incident was made in the July 1988 review in which he received his lowest score.

Billet further asserts that, beyond discrediting the proffered reasons for his termination, he introduced additional evidence that the decision to terminate him was motivated by age by pointing to (1) the more favorable treatment of younger employees; and (2) the effect, from an age standpoint, of the reorganization of the Philadelphia office.

As evidence of more favorable treatment of younger employees, Billet claims that, in the instances discussed above in which he was criticized or censured, younger employees were not similarly treated. Specifically, in the Wilco unauthorized quote situation, Paul Connolly was not criticized and in the Riddle case, Johnson was not criti-

cized. In the instance involving the closing of the Harrisburg office, Botta was not blamed. All of these men were younger than Billet and he regards this as "strong proof of age discrimination, because ... more favorable treatment for those not within the protected age group will support an inference of age discrimination."

Billet asserts that an analysis of the reorganization of the Philadelphia office from an age standpoint, "could well lead a fairminded jury to conclude that Connecticut General favored younger, less experienced managers over older, more experienced managers." In support of this statement, Billet states that prior to the reorganization, three of four supervisory individuals (Billet, Baker and Pfeiffer) were within the protected class of persons at least 40 years old. However, shortly after the reorganization, all were gone, Baker and Pfeiffer having resigned and Billet having been terminated, leaving younger and less experienced managers.

Finally, Billet asserts that the selection of Botta as city manager also shows pretext since Botta did not have a level of experience close to his or Baker's. According to Billet, Botta had one year's total exposure in selling group indemnity insurance when he was regional vice president, whereas Billet had 32 years' sales experience, 25 in management. Similarly, Baker had spent almost 30 years selling group indemnity insurance. Billet claims he also had more experience than Botta in pre-paid insurance, and that Baker had been selling pre-paid programs since February 1988. There was testimony that the position of city manager was, in essence, no different from that of sales manager prior to the reorganization.

**11. Our Analysis of the Evidence**

■ Considering all of the evidence and viewing it in the light most favorable to Billet, we find that he did not create a jury question on the issue of the bona fides of Connecticut General's articulated reasons for his termination to show them to be pretextual. Billet primarily disagreed with the objective evidence against him, *e.g.,* his

evaluation, misconduct probation, and relationship with underwriting, and argued that his performance was adequate. However, his view of his performance is not at issue; what matters is the perception of the decision maker. *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980). The fact that an employee disagrees with an employer's evaluation of him does not prove pretext. *See McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990) (affirming a summary judgment for an employer in a state law age discrimination diversity case, following federal law, by reason of the plaintiff's failure to raise a genuine issue of material fact that the employer's reason to discharge him was pretextual when the plaintiff acknowledged that his supervisors were dissatisfied with his performance but argued that the employer made "too big a deal" of his alleged problems).

■ The burden was on Billet to provide some evidence to establish that the articulated reasons for Connecticut General's decision regarding his employment were pretextual. He was required to introduce "evidence that casts doubt on his employer's contention that there was a legitimate business reason for [terminating him.]" *Healy,* 860 F.2d at 1220. Barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions. *Id.* Billet did not provide enough evidence to create a jury question regarding Connecticut General's serious articulated concerns with his performance and continued qualification for his job.

There is no doubt that the events underlying the misconduct probations were real, although Billet may disagree with Connecticut General's right to take these incidents seriously. Even if signing his supervisor's name to the automobile requisition form was not forgery in the criminal sense, this incident cannot reasonably be dismissed as not warranting concern by Connecticut General.

Billet's claim that because Connecticut General did not reprimand him for the car

requisition incident for four months shows that it fell back on this to create a record is simply unconvincing. In the context of a company as large as Connecticut General, the fact that it took four months is not surprising. It certainly does not support the inference which Billet urges—that Connecticut General fell back on his unauthorized signing of his superior's name as a pretext for firing him due to his age.

Similarly, although there may be some dispute as to the details of the Southbury incident, Billet admits that the meeting was interrupted. We reject Billet's assertion that Connecticut General's failure to seek his version of the incident undermines its reliance on it as a reason for his termination, because while the degree of his misconduct may be in doubt, he did cause a problem at Southbury.

There is no doubt that there were unauthorized quotes and changes to agreements involving Murray, Wilco and Riddle, serious matters indeed as they had negative financial impacts on Connecticut General. And despite his assertion that he had a good relationship with underwriting, Billet admitted that his office's relationship with underwriting was not always good. Furthermore, the Philadelphia office had a "no-quote" rate more than twice the recommended rate. We also point out that even if individual salespersons made mistakes, Billet supervised them and thus had some responsibility for the situations. This is the essence of supervision and we believe Connecticut General had the right to consider these unauthorized actions serious matters.

We also note that Billet is incorrect in alleging that the salesperson involved in the Riddle incident, Johnson, was not reprimanded. Johnson was put on probation because it was believed that he had signed Wilkey's name. Furthermore, the salesman in the Wilco matter, Paul Connolly, was denied compensation on the sale. Finally, despite Billet's claim that Botta was treated favorably, the record shows that Botta sought the regional vice-president position created pursuant to the reorganization, but did not receive it. There was testimony at trial that Billet's actions reflected negatively on Botta. Thus, Billet's claim that younger employees were treated preferentially is not well-founded.

Clearly, notwithstanding his explanation, Billet did not follow the designated procedure regarding the closing of the Harrisburg office. There is simply no doubt that he considered his own method of handling the matter better than that prescribed. But Connecticut General had every right to close the office its own way. Similarly, Billet's assertions regarding the complaints about him from Deanna Clendennon do not negate the fact that she complained to human resources about his treatment of her and that a memo regarding this was put in his file. Clendennon did not testify at trial in support of Billet's claims.

These undisputed facts and incidents were put forth by Connecticut General as reasons for the employment decision to terminate Billet. While Billet attempts to explain these incidents away, primarily by arguing that Connecticut General used these incidents to create a record to withstand an ADEA case, we do not understand why it is improper for an employer to maintain records regarding an employee's conduct even if it recognizes that the record may be useful in defense against a discrimination claim. Indeed, it would be expected that an employer would do exactly that.

█ Billet contends that his history of successful employment with Connecticut General reflected in his evaluations shows that the articulated reasons for his termination were pretextual. But Connecticut General never claimed that these evaluations were not accurate and the July 1988 evaluation clearly reflected a difference in performance. Furthermore, the events leading to his termination occurred after the evaluations.

We have stated that prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. *See Turner v. Schering–Plough Corp.*, 901 F.2d 335, 343–44 (3d Cir.1990). To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality. *See Healy*, 860 F.2d at

1215; *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1424–25 (7th Cir.1986) (an employee may lack specific qualification to fulfill changing job description).

A decision affecting an employee in the protected class does not become a discriminatory decision merely because made in the context of a reorganization, or because a younger employee is benefitted by the decision. Rather, the inquiry is whether the decision was motivated by the affected employee's age. If the employer's decision was based on legitimate business concerns, *i.e.*, choosing the person the employer believes is the best person for a job, the employee's disagreement with this decision does not prove pretext. *Healy*, 860 F.2d at 1220.

The July 1988 interim evaluation was made by a new supervisor, Botta, who obviously was not bound by any prior evaluations of Billet. In addition, Connecticut General was making far-reaching changes in its products line. Billet had always been an "indemnity" salesman. Connecticut General had every right to require its management to participate in and promote the new integrated product line.

We recognize that in its termination letter to Billet, Connecticut General stated his position was being eliminated due to its reorganization. But the undisputed fact is that the reorganization eliminated Billet's position and that three people—Billet, Baker and Botta—were considered for only two positions in the reorganized Philadelphia office. Overall, in light of the circumstance that there was problem after problem with Billet's performance, no reasonable jury could conclude that Connecticut General's articulated reasons for terminating Billet were pretextual. *Healy*, 860 F.2d at 1215–16 (although *post hoc* explanations made after the initiation of a lawsuit may be suspect, such do not *ipso facto* prove pretext; the plaintiff still has the burden to demonstrate that there is reason to disbelieve the explanation; without such evidence, there is no genuine issue of material fact). While Billet attempts to put the best possible face on the situation, there undoubtedly were many serious problems with his performance.

Furthermore, Billet was on notice of the problems he was having, specifically the underwriting difficulties, which had been noted in his 1986 review. *See Healy*, 860 F.2d at 1220 (in affirming a summary judgment for the employer, the court observed that the plaintiff knew prior to his discharge of the problems cited as reasons for the discharge). In Billet's case, the problems seemed to be getting worse, rather than being resolved. *Compare Turner v. Schering–Plough Corp.*, 901 F.2d at 345–46 (the plaintiff's "markedly improved performance" during his last two years at the defendant company could have led a rational jury to conclude that the company's articulated reasons for his termination were pretextual). Although proof of any one of the many incidents involving Billet might not have been sufficient to sustain the directed verdict, cumulatively they combined to preclude the jury from finding pretext.

Billet's assertion that a review of the reorganization of the Philadelphia office from an age standpoint could have lead a jury to determine that Connecticut General was favoring younger, less experience managers, is not well-founded in either the nature of the reorganization or the actual facts. The "reorganization" of the Philadelphia office affected only, or at least principally, the positions held by Billet, Baker and Botta. The undisputed facts are that only Billet was actually terminated, since Botta became city manager and Baker received the sales director position, though he subsequently left Connecticut General of his own accord. In his new position, Baker again answered to Botta. The subsequent changes in the Philadelphia office show that Virginia Pfeiffer, age 43, whether she became a sales director or remained as an assistant, was over 40 years of age. She left the position of her own accord. Botta was beaten out for the position of East Coast regional vice president by El Kenyon, who was over 40. When Botta resigned the city manager position, he was replaced by Larry Savage, age 43. The evidence simply does not sup-

port Billet's assertion that the reorganization of the Philadelphia office reflects that younger employees were preferentially treated. In fact, Connecticut General presented evidence that the entire national two-year reorganization of the 32 sales/city manager positions resulted in the employment of 24 persons over age 40, including eight over age 50.

Similarly, Billet's claims regarding Botta being chosen as city manager over him cannot change our result in light of the problems Billet was having. Botta was 39 when he became city manager and he had 16 years sales experience in the health care industry. In his last position prior to joining Connecticut General, he had managed 30 to 35 people and ran an operation with over $500 million in revenue.

█ We are not unmindful of the particular nature of discrimination suits. Direct proof of age discrimination is often unavailable or difficult to find. *Chipollini*, 814 F.2d at 899 (citation omitted). As the Supreme Court explained, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). We recognize that age discrimination, like other forms of discrimination, is often subtle. *Chipollini*, 814 F.2d at 899. However, we do not infer from the nature of discrimination suits that a jury determination is required in every case.

Billet relies on our decision in *Chipollini*, 814 F.2d 893, for his argument that summary disposition in this case was improper because issues of credibility were involved. In *Chipollini*, we reversed the district court's grant of summary judgment, explaining:

> The proffered reason for discharge is a subjective one. The plaintiff challenges the defendant's post-litigation articulation of its intent and the documentary evidence can be viewed as supporting the plaintiff's challenge. Consequently, the issue of pretext turns on [the employer's]

credibility and is not appropriate for resolution on a summary judgment motion. *Id.* at 901.

However, an employer's articulated reasons are not incredible simply because the employee asserts that such is the case. We emphasize that despite the breadth of the language in *Chipollini*, discrimination cases are inherently fact-bound. Accordingly, *Chipollini* does not stand for the proposition that an age discrimination case can never be taken from the jury. Rather, *Chipollini* stands for the proposition that when a plaintiff proffers evidence of pretext sufficient to create a genuine issue of material fact as to the credibility of the employer's articulated business reasons for his or her termination, summary disposition is foreclosed.

A plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision. Without some evidence to cast this doubt, this court will not interfere in an otherwise valid management decision. To require less would be to expose to litigation every management decision impacting on a protected party. *See also Lucas v. Dover Corp.*, 857 F.2d at 1403–04 (a court will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives); *Jorgensen v. Modern Woodmen of America*, 761 F.2d 502, 505 (8th Cir. 1985) ("[t]he ADEA is not intended to be used as a means of reviewing the propriety of a business decision on the part of [an employer]").

█ In this case, there was simply too much *objective* evidence of problems with Billet's performance to make his claim of pretext plausible, further distinguishing this case from *Chipollini*. Connecticut General presented substantial and objective evidence that it discharged Billet for legitimate business reasons. It identified numerous instances in which Billet either evaded or totally ignored company policies and procedures and cited fundamental problems between Billet and the underwriting department so drastic that it threatened the livelihood of the entire Philadelphia office. These problems were not alto-

gether new in 1988, but were cited in a review two years prior to Billet's termination. In addition, Connecticut General offered evidence that the problems may have been getting worse, as evidenced by the fallout from the Wilco and Riddle transactions. Furthermore, it produced evidence showing that Billet was unreceptive to the changes being made in its product line and that a positive approach to these changes was considered a requisite qualification for continued employment.

We acknowledge that Billet had, up until his July 1988 interim evaluation, received reasonably favorable evaluations and had received awards and been promoted within Connecticut General. However, even these evaluations were not totally without criticism and we do not think that the difference in the tone of the evaluations alone casts legally sufficient doubt on Connecticut General's articulated reasons for Billet's termination. In sum, we do not find that Billet submitted sufficient evidence of inconsistencies or implausibilities in Connecticut General's proffered reasons for his termination to support an inference that Connecticut General did not act for legitimate reasons.

In the end, the evidence proffered by Billet demonstrates that he had at one time performed competently in his position. But we note that a consequence of a management reorganization such as at Connecticut General is that employees who might have continued on in other times become subject to termination. To sustain his burden as to pretext, Billet had to introduce evidence to cast doubt on Connecticut General's contention that there was a legitimate business reason for terminating him. We agree with the district court that Billet's efforts were insufficient to cast such doubt.

Our recent decision in *Colgan v. Fisher Scientific Co.*, 935 F.2d 1407 (3d Cir.1991) (in banc) is not to the contrary. In *Colgan*, we reversed the district court's grant of summary judgment for the defendant-employer, Fisher, on the merits aspect of an ADEA claim as we found that the plaintiff-employee, Colgan, presented circumstantial evidence sufficient to raise a genuine issue of fact on the question of whether Fisher's negative evaluation of his performance, which formed the basis for his subsequent dismissal, was free from discriminatory animus.

In *Colgan*, we found particularly "compelling" the fact that the negative evaluation was given shortly after Colgan had refused to take early retirement and that this evaluation was aberrational as compared to earlier evaluations, a circumstance perhaps suggesting that Fisher was retaliating because Colgan declined early retirement. We also considered it noteworthy that this evaluation was the worst overall performance rating for *any* employee *ever* seen by the human resources manager and that, at the direction of upper management, it was made *even less favorable* than the original evaluation by his direct supervisor. At 1422.

In addition, Colgan presented affidavits from co-workers tending to support an inference of discrimination. These employees stated that Colgan was seeking to implement a newly introduced production schedule, thus raising a genuine issue of fact on this point, since Fisher had offered as a reason for Colgan's negative evaluation that he had refused to implement this schedule. At 1422. Finally, Colgan presented expert testimony that Fisher breached its standard procedures when it evaluated his performance, which testimony also supported a reasonable inference that the evaluation was a product of age discrimination. At 1422–23.

This case is not comparable. There is absolutely no evidence of retaliation by Connecticut General against Billet. Indeed, the exact opposite is true as demonstrated by the evidence that in both the automobile requisition and Southbury incidents, Parry used his influence to prevent Billet from being fired because he was so close to age 55, at which time his substantial retirement benefits would vest.[7] Fur-

---

7. Although not dispositive by any means, we note that once he turned 55, Billet became eligi-

thermore, there is no evidence that Connecticut General deviated from its own procedures in terminating Billet, except to the extent that it could have terminated him sooner but instead kept him on for an additional several months to guarantee him greater retirement benefits. Finally, there is no evidence that the management reorganization, either nationally or in Philadelphia, was a ruse intended to cover the illegal termination of older employees, and Billet does not contend otherwise.

In addition, the incidents in which Billet was involved simply outweigh, quantitatively and qualitatively, the alleged problems which Colgan had at Fisher. While in *Colgan,* Fisher could point to some problems with Colgan's performance, the incidents involving Billet, articulated as reasons for his termination, present a virtual laundry list of misconduct, insubordination and disregard for Connecticut General policy. Try as he might to re-characterize these incidents in terms of illegal motive by Connecticut General, Billet cannot overcome the simple fact that he had some involvement in each cited incident. Nor has Billet submitted sufficient evidence to convince us that these incidents, particularly when viewed as a whole, would not be troublesome to any reasonable employer.

In *Colgan,* we were required to view the evidence in the light most favorable to Colgan as the nonmoving party. Doing so, we found that the district court had erred in granting Fisher summary judgment. Likewise, here we are required to take a favorable view of the evidence presented by Billet in reviewing the district court's grant of the directed verdict, but this is as far as the similarity goes.

### B. *Willfulness*

■ Billet's second contention is that the district court erred in precluding the jury from considering the issue of willfulness. While under the ADEA, a successful plaintiff is entitled to liquidated damages in cases of willful violations of the act, 29 U.S.C. § 626(b), inasmuch as we hold that

the district court did not err in directing a verdict in favor of Connecticut General on the predicate issue of whether an ADEA violation occurred, we need not reach the willfulness issue. *Colgan v. Fisher Scientific Co.,* at 1423–24 n. 18; *Dreyer v. Arco Chem. Co.,* 801 F.2d 651, 657 (3d Cir.1986), *cert. denied,* 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987) (the "willful" inquiry arises only after the employer has been found liable under the ADEA).

### C. *Testimony of Andrew Baker*

■ Billet's third argument on appeal involves the district court's excluding certain testimony of his witness, Andrew Baker, sales manager of the pre-paid insurance sales force in Philadelphia from February 1988 until January 1989. As we have noted, Billet submitted an affidavit from Baker in opposition to Connecticut General's motion for summary judgment. This affidavit set forth Baker's observations regarding Billet's managerial skills and knowledge of indemnity insurance, along with comments on Botta's lack of knowledge about indemnity insurance and lack of managerial skill. Connecticut General then filed a pre-trial motion *in limine* to limit Baker's testimony at trial but no disposition was made of the motion before trial.

When Billet called Baker at trial, Connecticut General brought this outstanding motion to the attention of the court and requested an offer of proof from Billet as to Baker's testimony. In response to the court's asking what offer of proof was being made, Billet's counsel responded:

Mr. Phillips (counsel for Billet): The offer of proof—*Miss Middleton well-knows what he is going to testify about.* Andrew Baker was the sales director under HMO, Bill Billet's counterpart, as to what went on in 1988, which he is intimately familiar with. Mr. Billet and he worked closely together.

There is a lot Mr. Baker will testify. *She knows exactly what he will testify to. She took his deposition.*

Ms. Middleton (counsel for Connecticut General): I have no problem with his

---

ble to receive and in fact does receive a pension of $80,000 per year and health benefits. By remaining at Connecticut General until January

31, 1989, he became eligible to receive an additional three months' pay and an additional month's paid vacation.

testimony of incidents he has personal knowledge of, but we are concerned about a number of things. He never supervised Mr. Billet and I am concerned he is going to testify as to Mr. Billet's performance.

    \*     \*     \*     \*     \*     \*

Ms. Middleton: As to Mr. Baker's testimony as to Mr. Billet's performance in 1988, he did not work in the office with him. We have no problem about him testifying about the things he and Mr. Billet did something working together while working at Southbury.

We are concerned that he was unhappy with the company; he is going to—

The Court: Well, you can develop his unhappiness as a challenge to his credibility.

I think he can't pass any judgments on the performance of Mr. Billet's job except for those matters he was personally involved with him on. He can tell what he personally experienced without expressing any opinions on Mr. Billet's performance.

App. at 922–24. [Emphasis added.]

Following this colloquy, the district court sustained several objections by Connecticut General to questions relating to Baker's testimony. Billet urges that the district court committed reversible error by sustaining these objections.

We generally review evidentiary rulings for an abuse of discretion. *McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 921 (3d Cir.1985). However, we reject Billet's argument, and therefore need not address the specific objections sustained, on the procedural ground that his offer of proof was wholly inadequate to inform the court as to what Baker would testify. Given this failure to offer proof, Billet waived any claim of error on this point. *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1352–53 (3d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989) (the defendants waived their right to argue on appeal the relevancy of certain evidence by their failure to make an offer of proof at trial as to its relevancy). Furthermore, in almost every instance in which an objection was made to a specific question asked Baker, Billet made no effort to explain why the question was proper. In any event, the guidelines established by the court were perfectly appropriate and we find no indication in the record that the court excluded evidence that could have affected the outcome of this case.

### III. CONCLUSION

The order of November 16, 1990, will be affirmed.

SLOVITER, Chief Judge, dissenting.

My colleague Judge Greenberg has been scrupulously fair in portraying the evidence introduced by Connecticut General seeking to prove that it terminated Billet for a legitimate nondiscriminatory reason and in portraying the evidence introduced and arguments made by Billet seeking to show that a reasonable jury could find pretext. There is no need for me to repeat those arguments, and I will not do so.

This is undeniably a close case. Unlike the majority, I conclude that Billet has shown enough to present this close case to a jury. The fact that the first jury could not reach a unanimous verdict underscores how close the evidence was perceived by them. Indeed, it is precisely when the line is so fine that a jury is called upon to use its cumulative wisdom, experience, insight, and intuition to make the difficult factual decision entrusted to them.

One fact referred to by the majority but insufficiently stressed is determinative of my decision to dissent from the affirmance of the grant of a directed verdict for Connecticut General. Connecticut General admits that before it selected Botta as city manager, it considered a number of other possible candidates and narrowed the finalists to three persons. Billet was one of the three. A reasonable jury could conclude that if Billet lacked the required knowledge and experience in the prepared products business, had the character flaws reflected by the car requisition and Southbury incidents, and was as insubordinate and insensitive to the needs of the underwriting department as defendant now claims, Connecticut General would never have allowed his name to be among the three finalists for the important city manager position.

That is the stuff on which the jury may base a pretext determination.

The majority states that it is not the employee's view of his own performance that is at issue (concededly correct), but that "what matters is the perception of the decisionmaker." Majority typescript op. at 825. In cases such as this, the decisionmaker will always argue that in its view plaintiff is not the proper person for the job in question. It is unlikely that plaintiff will be able to produce evidence directly contradicting that subjective view. Instead, plaintiff must build a case grain by grain. When there is objective evidence (such as in this case the inclusion of Billet as a finalist for the position) which could discredit the proffered subjective view, then it is the function of a jury and not the court on a directed verdict to decide whether the ultimate decision to terminate the plaintiff was tainted with the impermissible consideration of age.